**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | : CIVIL ACTION NO. _____ |
| PLAINTIFF, | : Complaint for Injunctive and Other : Equitable Relief and Civil Monetary : Penalties Under the Commodity |
| v. | : Exchange Act |
| IGOR B. OYSTACHER and 3 RED TRADING LLC, | : JURY DEMANDED |
| DEFENDANTS. | : |

**COMPLAINT**

1.      Section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, § 747, 124 Stat. 1376, 1739, added a new section of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.* (2012), to, *inter alia*, prohibit disruptive trading practices in the commodity futures markets, including trading activity of the character of, or commonly known to the trade as, "spoofing," in legislation enacted to reduce risk, increase transparency, and promote market integrity within the financial system.

2.      From December 2011 through at least January 2014 (the "relevant period"), Igor B. Oystacher ("Oystacher") and the company he owns and controls, 3 Red Trading LLC ("3 Red") (collectively "Defendants"), intentionally and repeatedly engaged in a manipulative and deceptive spoofing scheme while placing orders for and trading futures contracts ("futures") on multiple

registered entities.  Their scheme created the appearance of false market depth that Defendants exploited to benefit their own interests, while harming other market participants.

3.      Oystacher and 3 Red engaged in this scheme by manually placing large (at least doubling the number of contracts offered or bid at those price levels, or better) passive order(s) on one side of the market at or near the best bid or offer price, which were intended to be canceled before execution.  Defendants placed these order(s) (the "spoof orders") through accounts owned by 3 Red to create the false impression of market depth and book pressure in a certain direction (to either buy or sell) and induce other market participants into placing orders on the same side of the market and at similar price levels as the spoof orders.  The Defendants would then cancel or attempt to cancel all of the spoof order(s) before they were executed and virtually simultaneously "flip" their position from buy to sell (or vice versa) by placing at least one aggressive order on the other side of the market at the same or better price to trade with market participants that had been induced to enter the market by the spoof orders they just canceled.  This strategy allowed Defendants to buy or sell futures contracts in quantities and/or at price levels that would not have otherwise been available to them in the market, absent the spoofing conduct.

4.      Oystacher and 3 Red applied their pattern of manipulative and deceptive spoofing on at least fifty-one trading days between December 2011 and January 2014, while trading contracts in at least five futures products on at least four exchanges: (1) the Commodity Exchange Inc.'s ("COMEX") March 2012 copper futures contract ("copper") on December 1, 2, 5-9, 12-16, and 19-20, 2011; (2) the New York Mercantile Exchange's ("NYMEX") spot crude oil futures contract ("crude oil") on May 7, 9-11, 2012; (3) the NYMEX's spot month natural gas contract ("natural gas") on November 30 and December 3-4, 2012; (4) the CBOE Futures Exchange's  ("CFE") March 2013 volatility index futures contract ("VIX") on February 19-22, 25-28, and March 1, 4-5,

2013, and the April 2013 VIX contract on March 6, 7, 11, 12, 18-21, 2013; and (5) the Chicago

Mercantile Exchange's ("CME") spot month E-Mini S&P 500 futures contract on June 11-12,

2013, December 16-19, 2013, and January 6-10, 2014 (collectively "the relevant markets" and

"Appendix dates").[1]  Oystacher and 3 Red were the largest traders in the respective contracts for

copper, natural gas, VIX, and E-Mini S&P 500 futures, and the third largest trader in the spot-

month contract for crude oil futures (as measured by number of contracts traded) during these

periods, despite the presence of thousands of other traders in these markets.

5.      These repeated and intentional violations of the Act and the Commission

Regulations promulgated thereunder ("Regulations"), 17 C.F.R. §§ 1 *et seq*. (2014), pose a serious

threat to the integrity of the markets for these futures contracts.

6.      By this conduct and further conduct described herein, Defendants Oystacher,

individually and on behalf of 3Red, and 3 Red have engaged, are engaging, or are about to engage

in acts and practices that violate Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012),

which makes it unlawful for any person to engage in trading or conduct on a registered entity that is

of the character of or commonly known to the trade as "spoofing," as well as Section 6(c)(1) of the

Act, 7 U.S.C. § 9(1) (2012), and CFTC Regulation 180.1, 17 C.F.R. § 180.1 (2014), which make it

unlawful for any person to employ or attempt to use or employ any manipulative or deceptive

device, scheme, or artifice in connection with commodity futures.

7.      During the relevant period, Oystacher operated and controlled 3 Red, and is

therefore liable for this entity's conduct pursuant to Section 13(b), 7 U.S.C. § 13(b) (2012).

Oystacher committed the acts described herein within the course and scope of his employment at, or

---

[1] An Appendix identifying flip and spoof orders, by date and time, is attached as Exhibit A to the Complaint.

agency with, 3 Red, and 3 Red is therefore liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2014), as a principal for its agents' acts, omissions or failures.

8.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the CFTC brings this action to enjoin Defendants' unlawful acts and practices, and to compel Defendants' compliance with the Act and Regulations.  In addition, the CFTC seeks civil monetary penalties and remedial relief, including but not limited to, trading prohibitions, disgorgement, pre-and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## I.   JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which authorizes the Commission to seek injunctive relief against any person, or to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

10.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), in that Defendants reside in this District, transact business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

## II.   THE PARTIES

11.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2014).  One of its core responsibilities is to protect the public

interest by deterring and preventing manipulation of the commodity markets or futures markets as well as other disruptions to market integrity. *See* 7 U.S.C. § 5(b) (2012).

12. Defendant **Igor B. Oystacher** is a founder, President and Chief Executive Officer of 3 Red, a proprietary futures trading company, as well as its principal trader. He was a principal and majority owner of 3 Red during the relevant period. He was responsible for developing the trading strategy and placing the orders which constitute the violations of the Act and Regulations. Oystacher resides in Chicago, Illinois, and has never been registered with the Commission.

13. Defendant **3 Red Trading LLC** is a proprietary futures trading firm, incorporated as a limited liability company under the laws of Delaware, and located at 440 S. LaSalle Street, Suite 2200, Chicago, Illinois 60605. 3 Red was first incorporated in June 2011 and continues to operate at the time of this filing. 3 Red has never been registered with the Commission.

**Other Entities**

14. The **CME Group, Inc.** is a Delaware corporation with its principal place of business in Chicago, Illinois, that is the holding company and parent of four designated contract markets ("DCMs"): the CBOT, CME, NYMEX, and COMEX.

15. The **CBOE Futures Exchange, LLC ("CFE")** is a registered DCM and Delaware corporation with its principal place of business in Chicago, Illinois.

### III. STATUTORY PROVISIONS

16. **Spoofing**. Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), makes it unlawful for any person to engage in trading or conduct on a registered entity that is of the character of or commonly known to the trade as "spoofing." Section 4c(a)(5)(C) explains "spoofing" as "bidding or offering with the intent to cancel the bid or offer before execution."

17. **Employment of a Manipulative or Deceptive Device or Contrivance**. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2014), make it

unlawful for any person to intentionally or recklessly employ, or attempt to use or employ any manipulative device, scheme, or artifice in connection with commodity futures.

## IV.  FACTS

### A.  Factual Background

18.     A **Futures Contract** is an agreement to purchase or sell a financial instrument or physical commodity for delivery or cash settlement in the future at a price determined at initiation of the contract that obligates each party to the contract to fulfill the contract at the specified price. Futures contracts are used to assume or shift price risk, and may be satisfied by cash settlement, delivery, or offset.  Futures contracts are commonly used to hedge risks or to speculate on the price of commodities.

19.     A **Spot-Month Contract** (or "front month contract") refers to the futures contract with the delivery date closest to the present date.  It is often the most liquid contract month in a given futures contract.

20.     The CME Group's electronic trading platform, **Globex**, offers market participants the opportunity to electronically trade COMEX copper, NYMEX crude oil, NYMEX natural gas, and E-Mini S&P 500 futures, among other futures contracts.  The CFE's electronic trading platform, "Command platform" offers electronic trading in its VIX futures contracts.  These electronic trading platforms are open-access marketplaces that allow market participants to view the aggregated book of visible limit orders and prices for futures contracts and enter their own orders, and employ pre-defined sets of trade matching rules to execute buy orders opposite sell orders for specific quantities at specific prices.

21.     An **Order**, as used for electronic trading on CME and CFE markets, is a request submitted to an exchange to buy ("bid") or sell ("offer" or "ask") a given futures contract that has been acknowledged by an exchange and entered into an exchange's order book.  An order may be

for one or more contracts or "lots." An "order cancellation" is the termination of a pending order by the trader that placed the order before it is fully "executed" or "filled" by being matched with an "opposite" (buy or sell) order for the same or better price. The period of time an order is pending in the market before final execution or cancellation is referred to as its "duration."

22. When a "buy" or "sell" order is submitted to an exchange's electronic trading system, the order becomes part of the **Order Book**. The Order Book is the electronic market structure where a trade matching algorithm is applied to posted buy and sell orders matching them to each other with certain priorities for execution, as discussed below.

23. Market participants who want to trade electronically may view aggregated limit Order Book data known as market depth data to see prices and the current aggregated numbers of visible orders and contracts at ten price levels from the lowest priced order to sell to the highest priced order to buy ("top of the market," "best bid and offer," or "BBO"). The **Bid-Ask Spread** is the difference between the lowest priced order to sell and the highest priced order to buy.

24. Both the CME's and CFE's electronic trading platforms (Globex and Command platform) employ a **First In First Out ("FIFO")** methodology to match orders to buy and sell. FIFO functions such that all of the orders at the best available bid or ask price must be executed or removed before the pending orders at the next available best bid or ask price can be executed. Multiple orders at one price level will be filled in the order they are placed according to the principle of "time and price priority." The "best" bid price is the highest available price for buy orders that are posted in the market. The "best" ask or offer price is the lowest available price for sell orders that are posted in the market. "Better" prices refer to higher prices for buy orders or lower prices for sell orders.

7

25.     An **Aggressive Order** is one that crosses the bid-ask spread at time of entry.  In other words, an aggressive buy order will be priced at or above the lowest priced sell order (best offer / ask) in the book and an aggressive sell order will be priced at or below the highest pending buy order (best bid).  An aggressive order will be immediately executed, at least in part, and fully executed if enough contracts are posted on the Order Book at that price or better, to fill the order.

26.     A **Passive Order** is one that is at the same or worse price than either the lowest existing sell order or the highest existing buy order at time of entry.  Passive orders are said to "rest" in the book and will only result in a trade if an aggressive order from another trader matches with the order.

27.     An **Iceberg Order**, also known as a hidden quantity order, is an order type offered by certain designated contract markets on electronic trading platforms whose order quantities (i.e., number of contracts) are only partially visible in the Order Book to other market participants. During the relevant time, market participants were able to place buy or sell orders as iceberg orders in the NYMEX's natural gas and oil contracts, the COMEX's copper contract, and the CME's E-Mini S&P 500 contract.  The use of iceberg orders was not available for market participants trading the CFE's VIX contract.

28.     **Book Balance** refers to the numeric relationship between the number of pending ("resting") visible contracts offered to buy on one side of the market and contracts offered to sell on the other side of the market.  Many market participants (including those employing automated trading algorithms) rely on the information contained in the Order Book and consider it when making trading decisions.  For instance, if the aggregate size and number of sell orders significantly outweighs the total aggregate size and number of buy orders, market participants may believe that book balance indicates that supply is exceeding demand and a price drop is imminent and may

decide to place orders to sell. Many market participants utilize algorithmic trading programs that analyze the market for changes in the price, number, size, and balance of orders/contracts visible in the Order Book at various price levels and use that information to make trading decisions. Likewise, orders which substantially change the volume of contracts bid or offered at one or more price levels may be said to create **Book Pressure** on that side of the market. Consequently, changes in the visible orders on electronic trading platforms can affect market participants' trading conduct, thereby affecting liquidity and/or market prices for futures contracts, in copper, oil, natural gas, E-Mini S&P 500, and VIX.

29.     **Volume** is the number of futures contracts purchased or sold during a specified period of time.

30.     An **Automated Trading System**, "ATS," or Algorithmic Trading Program, or "Algo" is computer trading software that is programmed to generate and send orders to trade futures contracts based on pre-programmed trading instructions. The algorithms can automatically place, cancel and modify orders in response to the appearance of certain market conditions, including changes in the Order Book.

31.     A **long position** in a futures contract consists of one or more buy orders that have been executed but have not yet closed with an offsetting sale or delivery. Depending upon the terms of the futures contract, the holder of a long position is obligated to offset prior to the delivery period, or to accept delivery of a commodity. Financial futures like the E-Mini S&P 500 and VIX contracts are settled exclusively in cash. The holder of a long position profits from a rise in the price of the futures contract.

32.     A **short position** in a futures contract consists of one or more sell orders that have been executed but have not yet closed with an offsetting purchase or delivery. The holder of a short

position is obligated to offset prior to the delivery period, or else physically deliver or financially settle with the holder of a long position. The holder of a short position profits from a fall in the price of the contract.

**B.** **Market Fundamentals**

33.     The vast majority of trading in Copper, Crude Oil, Natural Gas, VIX, and E-Mini S&P 500 futures contracts is conducted electronically. In electronic trading, orders may be entered, modified, and canceled through a computer portal to the electronic trading platform. Both automated trading programs and individual/manual traders may trade through such portals.

**i.**     **COMEX Copper Futures Contract**

34.     The COMEX copper futures contract is regularly traded for delivery during the current calendar month, the next 23 calendar months, and any other March, May, July, September, or December month falling within the 60-month period beginning with the current month. One delivery contract is equal to 25,000 pounds of copper. The March 2012 COMEX Copper Futures Contract carried an average daily trading volume of approximately 40,662 contracts on the relevant dates.

35.     Prices of the COMEX Copper futures contract are quoted in cents per pound. During the relevant time period, the COMEX Copper futures contract traded between approximately 326.70 and 361.55 cents per pound, which equates to a price of $81,675 to $90,387.50 per contract.

36.     Prices of the COMEX Copper futures contract move in increments of $0.0005 per pound, known as a "tick." The movement in price of one "tick" results in a change in the value of the contract by $12.50.

37.     During the relevant dates, the trading day for COMEX copper began on Globex at 5:00 p.m. CST and continued to 4:15 p.m. CST the next day.  Trading of copper on Globex closed during the period between 4:15 p.m. and 5:00 p.m. CST each day.

**ii.      NYMEX Crude Oil Futures Contract**

38.     The NYMEX crude oil futures contract for Light Sweet Crude Oil (CL) is regularly traded for delivery each month during the current year and the following five years.  One delivery contract is equal to 1,000 barrels of crude oil.  The spot-month NYMEX Crude Oil Futures Contract carried an average daily trading volume of approximately 294,048 contracts on the relevant dates.

39.     Prices of the NYMEX crude oil futures contract are quoted in dollars per barrel. During the relevant time period, the NYMEX crude oil futures contract traded between approximately $96.13 and $97.94 dollars per barrel, which equates to a price of $96,130 to $97,940 per contract.

40.     Prices of the NYMEX crude oil futures contract move in increments of $0.01 per barrel, known as a "tick."  The movement in price of one "tick" results in a change in the value of the contract by $10.

41.     During the relevant dates, the trading day for NYMEX crude oil began on Globex at 6:00 p.m. and continued to 5:15 p.m. EST the next day.  Trading closed from 5:15 p.m. until 6:00 p.m. EST each day.

**iii.     NYMEX Natural Gas Futures Contract**

42.     The NYMEX Henry Hub natural gas contract (NG) is traded for delivery on a monthly basis throughout each year.  One delivery contract is equal to 10,000 million British thermal units (mmBtu).  The spot-month NYMEX natural gas futures contract carried an average trading volume of approximately 251,536 contracts per day on the relevant dates.

43. Prices of the NYMEX natural gas futures contract are quoted in dollars per mmBtu. During the relevant time period, the NYMEX natural gas futures contract settled between approximately $3.539 and $3.591 dollars per mmBtu, which equates to a price of $35,390 to $35,910 per contract.

44. Prices of the NYMEX natural gas futures contract move in increments of $0.001 per mmBtu, known as a "tick." The movement in price of one "tick" results in a change in the value of the contract by $10.00.

45. During the relevant dates, the trading day for NYMEX natural gas contract began on Globex at 6:00 p.m. EST and continued to 5:15 p.m. EST the next business day. Trading closed from 5:15 p.m. until 6:00 p.m. EST each day.

### iv. CFE VIX Futures Contract

46. The CFE VIX futures contract is regularly traded for delivery in each of the nine near-term months and quarterly after that, for five quarters. The contract multiplier for each VIX contract is $1000. The CFE VIX Futures Contract carried an average trading volume of approximately 84,796 contracts per day on the relevant dates.

47. Prices of the CFE VIX futures contract move in increments of .05 points per contract, known as a "tick." The movement in price of one "tick" results in a change in the value of the contract by $50.00. During the relevant time period, the CFE VIX futures contract traded between approximately $13.90 and $17.65, which equates to a dollar value between $13,900 and $17,650 per contract.

48. During the relevant dates, the regular trading day for VIX began on CFE Command at 8:30 a.m. and continued to 3:15 p.m. CST, Monday through Friday, with extended trading hours between 3:30 p.m. and 8:30 a.m. CST.

v.        **CME E-Mini S&P 500 Futures Contract**

49.    The CME E-Mini S&P 500 futures contract is regularly traded for four contract

months: March, June, September, and December.  One contract is equal to $50 x the S&P 500

Index.  The spot-month CME E-Mini S&P 500 contract carried an average trading volume of

approximately 2,595,554 contracts per day during the relevant dates in June 2013 and 1,608,991

contracts per day during the relevant dates in December 2013 and January 2014.

50.    Prices of the CME E-Mini S&P 500 futures contract move in increments of .25

index points, known as a tick.  The movement in price of one "tick" results in a change in the value

of the contract by $12.50.  During the relevant time period in June 2013, the CME E-Mini S&P 500

futures contract traded between approximately 1609.90 and 1627.10 index points, which equates to

a dollar value between $80,495 and $81,355 per contract and in December 2013 and January 2014

the CME E-Mini S&P 500 futures contract traded between approximately 1773.00 and 1837.70

index points, which equates to a dollar value between $88,650 and $91,885 per contract.

51.    During the relevant dates, the trading day for the CME E-Mini S&P 500 futures

contract began on Globex at 5:00 p.m. and continued to 4:15 p.m. CST the next day.  Trading

closed from 4:15 p.m. until 5:00 p.m. CST each day.

**C.     Defendants' Manipulative and Deceptive Spoofing Scheme**

**1.     Defendants' Manipulative and Deceptive Spoofing Strategy Involved Similar
Conduct Across Multiple Futures Markets**

52.    Oystacher and 3 Red engaged in manipulative or deceptive trading strategies that

spoofed various markets while placing orders for, and trading futures contracts through, accounts

owned by 3 Red during the relevant period, including in: copper during December 2011; crude oil

in May 2012; natural gas during November and December 2012; VIX during February and March

2013; and the CME's E-Mini S&P 500 in June and December 2013, and January 2014.

53.     Oystacher and 3 Red manually traded these futures markets, using a commercially available trading platform, which included a function called "avoid orders that cross."  The purpose of this function is to prevent a trader's own orders from matching with one another.  Defendants exploited this functionality to place orders which automatically and almost simultaneously canceled existing orders on the opposite side of the market (that would have matched with the new orders) and thereby effectuated their manipulative and deceptive spoofing scheme, as described below.

54.     Oystacher and 3 Red engaged in a similar pattern of spoofing conduct across all relevant markets during the relevant period, which included:

    i.   placing at least one, and in many instances multiple "spoof orders" on one side of the market with the intent to cancel these orders before execution;

    ii.  placing these orders at or near the best bid or offer price as passive orders, behind existing orders;

    iii. placing these orders for a large number of contracts, at least doubling the number of contracts offered or bid at those price levels or better, to create the false impression of market depth and book pressure on that side of the market, in order to induce other market participants (including both manual traders and those using computer algorithms to make trading decisions) to place orders on the same side of the market;

    iv.  canceling all of the spoof order(s) simultaneously within one second of entry, largely before they could execute;

    v.   using the "avoid orders that cross" functionality to place "flip" order(s) as aggressive order(s) which would simultaneously (within 5 milliseconds) cancel any opposite order(s) at the same or better price.  The aggressive flip order(s), except in one instance, then traded against market participants that had joined the "spoof orders"

14

before those market participants could assess and react to the updated market

information; and

vi. often placing the aggressive flip orders as partially visible "iceberg" orders to

maximize the likelihood they would be filled.

55.     Oystacher and 3 Red engaged in these manipulative and deceptive "flips" during the

relevant period and at least 1316 times on the dates reflected in Exhibit A to the complaint, and in

the process placed thousands of spoof orders in the relevant markets, as set out in the Table below.

| Futures Contract | Trading Days | Spoofing Incidents in Exhibit A ("Flips") | Spoof Orders Making up "Flips" in Exhibit A | Total # Contracts Underlying Spoof Orders |
|---|---|---|---|---|
| Copper | 14 | 288 | 1633 | 24,354 |
| Crude Oil | 4 | 324 | 1102 | 26,204 |
| Natural Gas | 3 | 330 | 1574 | 29,590 |
| VIX | 19 | 89 | 284 | 37,694 |
| E-Mini S&P 500 June 2013 | 2 | 59 | 202 | 35,523 |
| E-Mini S&P 500 Dec. 2013; Jan. 2014 | 9 | 226 | 412 | 206,425 |
| **Total** | **51** | **1,316** | **5,207** | **359,790** |

**a.  Use of Spoof Order(s) to Create the False Impression of Market Depth and Book Pressure**

56.     Defendants initiated their manipulative and deceptive spoofing strategy by placing

large visible passive orders at or near the best bid or offer price to create the false impression of

market depth and book pressure in a desired direction.  They created this false appearance of market

depth and pressure by the large number and/or size (in number of contracts) of the spoof order(s)

they placed.  From the perspective of market participants trading on the electronic platform, only

the number of orders at various price levels and the number of contracts at each price level were

visible; the identity of the originating market participant for each order was not visible.

15

Accordingly, Defendants' placement of more than one spoof order created the appearance that multiple market participants may have become interested in executing orders at that price.

57.     In each of the examples identified in Exhibit A, Defendants' spoof orders more than doubled the number of contracts offered or bid at those price levels or better after their spoof orders were placed.  The number of spoof orders Oystacher and 3 Red placed as part of each example in Exhibit A ranged from one to fourteen.

58.     Defendants' spoof orders identified in Exhibit A suddenly and dramatically increased the number of order(s) and contracts on that side of the market at those price levels, creating the appearance of sudden market depth and book pressure:

| Futures Contract | Mean # of Spoof Orders per Flip | Mean # of Spoof Order Contracts per Flip | Mean Percentage by which Defendants' Spoof Orders increased # of Contracts at price level or better |
|---|---|---|---|
| Copper | 5.67 | 84.56 | 1877% |
| Crude Oil | 3.40 | 80.88 | 991% |
| Natural Gas | 4.77 | 89.67 | 1710% |
| VIX | 3.19 | 423.53 | 1696% |
| E-Mini S&P 500 June 2013 | 3.42 | 602.08 | 996% |
| E-Mini S&P 500 Dec. 2013; Jan. 2014 | 1.82 | 913.38 | 880% |

59.     Defendants' spoof orders created a strong (but false) signal regarding interest on one side of the market.  These large spoof orders deceptively encouraged other market participants (and

their algos programmed to react to changes in book pressure) to enter orders on the same side of the market as the spoof orders.

60.     Oystacher and 3 Red knew or recklessly disregarded the fact that the spoof orders would create the false appearance of market depth and book pressure and result in misinformation triggering other market participants' trading activity.

**b.  Placement of Spoof Orders in a Manner to Avoid being Filled**

61.     Oystacher and 3 Red placed the spoof orders in a manner to avoid being filled by placing  them as passive orders at or near the best bid or ask price level, behind existing orders, and canceling them less than a second after they were placed.

62.     In each of the incidents identified in Exhibit A, Oystacher and 3 Red placed spoof orders at or near the existing best bid or offer price, where most market participants focus their attention, yet behind orders which were already pending in the market at those price levels.  This meant that Defendants' "spoof orders" were at risk for being filled only if the pending orders at those price levels were filled first, based on the Exchanges' FIFO rules.

63.     Oystacher and 3 Red further minimized the probability that the spoof orders identified in Exhibit A would be filled by canceling them less than one second after placing them. Indeed, in some of the markets, the average duration of the spoof events for the spoof orders identified in Exhibit A was significantly less than one second, as shown below.

64.     The following table displays the average duration of Defendants' spoof events for the spoof orders identified in Exhibit A as well as the average number of orders and contracts already bid or offered which were positioned in front of Defendants' spoof orders at their respective price levels or better:

| Futures Contract | Mean Duration for Spoof Events for Orders in Exhibit A (in Seconds) | Mean # of Existing Orders at Prices at or Better than Spoof Orders | Mean # of Existing Contracts Offered or Bid at Prices at or Better than Spoof Orders |
|---|---|---|---|
| Copper | .740 | 4.57 | 11.13 |
| Crude Oil | .644 | 9.15 | 15.60 |
| Natural Gas | .699 | 5.32 | 13.83 |
| VIX | .752 | 8.85 | 87.55 |
| E-Mini S&P 500 – June 2013 | .714 | 35.10 | 175.02 |
| E-Mini S&P 500 – Dec. 2013; Jan. 2014 | .614 | 38.15 | 229.76 |

### c. Simultaneous Cancellation of Spoof Orders and Placement of Aggressive Flip Order(s)

65.     Oystacher and 3 Red next placed one or more aggressive flip orders at the same or better price on the other side of the market (sell/buy) using the avoid orders that cross functionality. As a result of the entry of the aggressive flip order(s), Defendants' spoof orders at that price or better were immediately canceled using only one click – or push of the button. Defendants' cancellation of the spoof orders and "flip" to the other side happened almost simultaneously, taking place in less than or equal to 5 milliseconds (i.e., thousandths of a second).

66.     Defendants' use of the avoid orders that cross functionality not only prevented the flip orders from matching with the spoof orders, but also allowed Defendants to cancel the pending spoof orders and place aggressive order(s) on the other side of the market at the same or better price *before* other market participants could assess and react to the disappearance of the false market depth and book pressure the spoof orders had created.

67.     Defendants' decision to place "flip" orders as *aggressive* orders that would instantly match with existing orders on the other side of the bid-ask spread stands in stark contrast to the

spoof orders placed as *passive* orders that were not at risk for immediate execution at time of entry. Oystacher and 3 Red placed and canceled the spoof orders in this manner to maximize their opportunities to trade in quantities and/or at price levels that would not have otherwise been available absent the appearance of false market depth and book pressure, and the resulting joinder by other market participants.

### d. Defendants' Placement of the Flip Orders as Partially Visible Iceberg Orders

68.     Oystacher and 3 Red placed a high percentage of their "flip" orders (following the canceled spoof orders) as iceberg orders in the markets that allowed icebergs – *i.e.*, copper, crude oil, natural gas, and E-Mini S&P 500.  Defendants thus hid the true size of many of the flip orders, intended to be filled, from the market.

69.      Oystacher and 3 Red did so to maximize the likelihood that the flip orders would be filled and to avoid counteracting the false impression of market depth and book pressure that was created with the fully visible, but recently canceled, spoof orders.

70.     The following table compares the percentage of Defendants' orders in the one second period prior to flipping that were placed as iceberg orders[2] to the percentage of the "flip orders" placed as iceberg orders in the spoof incidents identified in Exhibit A:

---

[2] The iceberg orders placed in the one second period before the flip are not identified in Exhibit A as spoof orders.

| Futures Contract | % of Iceberg Orders Placed within 1 Sec. preceding Flip at the same or better price | % of Iceberg Orders Placed During 5 ms After Flip at same or better price |
|---|---|---|
| Copper | 0.24% | 72.94% |
| Crude Oil | 0.63% | 96.60% |
| Natural Gas | 0.19% | 89.34% |
| VIX | NA | NA |
| CME E-Mini S&P 500 – June 2013 | 0.00% | 79.66% |
| CME E-Mini S&P 500 – Dec. 2013; Jan. 2014 | 0.00% | 18.58% |

**2. Detailed Examples of Defendants' Manipulative and Deceptive Spoofing Strategy**

**a.     Natural Gas on November 30, 2012**

71.     At 8:02:34.360 a.m. on November 30, 2012, Defendants were short 10 futures contracts in natural gas with additional pending orders to sell 182 contracts.  Beginning at 8:02:34.576 a.m., Defendants proceeded to place seven visible orders to sell a total of 103 contracts behind other resting orders at the existing best offer price of $3.671, as illustrated below:

| | State of the Visible Order Book Prior to Defendants' Orders 08:02:34.360 | | | | Defendants' Order Entry Activity 08:02:34.576 – 08:02:34.918 | | | |
|---|---|---|---|---|---|---|---|---|
| | ORDER BOOK | | | | OYSTACHER | | | |
| **Price** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** |
| **3.675** | | | 29 | 135 | | | | |
| **3.674** | | | 20 | 35 | | | | |
| **3.673** | | | 17 | 38 | | | | |
| **3.672** | | | 18 | 32 | | | | |
| **3.671** | | | **5** | **9** | | | **7** | **103** |
| **3.670** | **8** | **18** | | | | | | |
| **3.669** | 18 | 26 | | | | | | |
| **3.668** | 19 | 33 | | | | | | |
| **3.667** | 22 | 32 | | | | | | |
| **3.666** | 15 | 24 | | | | | | |
| **TOTALS:** | **82** | **133** | **89** | **249** | | | **7** | **103** |

72.     Defendants' seven spoof orders increased the visible market depth (measured in contracts offered) at the best offer price by more than 1100% compared to what was visible to market participants at that same price before Defendants placed these spoof orders.

73.     After Defendants' spoof orders appeared in the order book, other market participants placed orders to sell, and a new best sell/offer price of $3.670 was established, as shown below:

| State of the Visible Order Book<br>After Defendants' Orders<br>08:02:34.951 | | | | |
|---|---|---|---|---|
| **ORDER BOOK** | | | | |
| **Price** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** |
| **3.674** | | | 19 | 34 |
| **3.673** | | | 17 | 32 |
| **3.672** | | | 21 | 41 |
| **3.671** | | | 16 | 119 |
| **3.670** | | | 3 | 3 |
| **3.669** | 9 | 21 | | |
| **3.668** | 23 | 39 | | |
| **3.667** | 20 | 30 | | |
| **3.666** | 17 | 25 | | |
| **3.665** | 13 | 28 | | |
| **TOTALS:** | **82** | **143** | **76** | **229** |

74.     The market for natural gas futures at 8:02:35.281 a.m., immediately before

Defendants canceled their spoof orders, looked as follows:

| State of the Visible Order Book<br>Prior to Defendants' Cancels<br>08:02:35.281 | | | | |
|---|---|---|---|---|
| **ORDER BOOK** | | | | |
| **Price** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** |
| **3.674** | | | 20 | 35 |
| **3.673** | | | 19 | 34 |
| **3.672** | | | 21 | 41 |
| **3.671** | | | 18 | 121 |
| **3.670** | | | 4 | 4 |
| **3.669** | 9 | 21 | | |
| **3.668** | 23 | 39 | | |
| **3.667** | 20 | 30 | | |
| **3.666** | 17 | 25 | | |
| **3.665** | 13 | 28 | | |
| **TOTALS:** | **82** | **143** | **82** | **235** |

75.     At 8:02:35.304 a.m., market data reflects that Defendants canceled their seven spoof orders at $3.671, although they had been pending less than 750 milliseconds, and none had resulted in any fills.  Market data indicates that over the next three milliseconds, Defendants aggressively "flipped" and crossed the spread by placing two buy orders for a total of 50 contracts at a price of $3.671.  Because Defendants' flip orders to buy would have been matched against their pending spoof orders to sell at the same price, the avoid orders that cross function in their trading platform automatically canceled these spoof orders.  In this example, Defendants were able to almost simultaneously place new order(s) and cancel existing opposite orders at the same or better price with a single button push.

76.     Over the next ten seconds, Defendants' aggressive flip orders to buy 50 contracts were filled with 39 contracts at $3.671 and 4 contracts at 3.670.  About a second after the last fill, Oystacher and 3 Red canceled the remaining portion of one of the flip buy orders.

77.     The following table illustrates Defendants' cancel and flip activity as well as the state of the Order Book at 08:02:35.309 a.m., after Defendants' flip orders had been mostly filled and subsequently canceled:

| | State of the Visible Order Book After Defendants' Cancel & Flip 08:02:35.309 | | | | Defendants' Cancel & Flip Activity 08:02:35.304 – 08:02:35.307 | | | |
|---|---|---|---|---|---|---|---|---|
| | ORDER BOOK | | | | OYSTACHER | | | |
| **Price** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** |
| **3.676** | | | 19 | 77 | | | | |
| **3.675** | | | 26 | 132 | | | | |
| **3.674** | | | 20 | 35 | | | | |
| **3.673** | | | 18 | 33 | | | | |
| **3.672** | | | **18** | **38** | | | | |
| **3.671** | 1 | 1 | | | 2 | 50 | ~~7~~ | ~~103~~ |
| **3.670** | 3 | 4 | | | | | | |
| **3.669** | 15 | 28 | | | | | | |
| **3.668** | 23 | 39 | | | | | | |
| **3.667** | 20 | 30 | | | | | | |
| **TOTALS:** | **62** | **102** | **101** | **315** | **2** | **50** | | |

78.     After Defendants' flip orders were mostly filled and then partially canceled, the new lowest sell price was $3.672.  Use of the spoof orders in this instance enabled Defendants to purchase 43 contracts, most at a price not previously available.

**b.  E-Mini S&P 500 on January 6, 2014**

79.     At 02:01:45.702 p.m., on January 6, 2014, Oystacher and 3 Red were long 130 E-Mini S&P 500 futures contracts, with additional pending orders to sell 3,279 contracts and orders to buy 124 contracts.  Beginning at 2:01:47.260 p.m., Defendants proceeded to place two visible spoof orders to sell a total of 921 contracts behind other resting orders at the existing best offer price of $1824.00, as illustrated below:

24

| | State of the Visible Order Book Prior to Defendants' Orders 2:01:47.256 | | | | Defendants' Order Entry Activity 2:01:47.260 – 2:01:47.270 | | | |
| | ORDER BOOK | | | | OYSTACHER | | | |
| Price | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts |
|---|---|---|---|---|---|---|---|---|
| 1825.00 | | | 151 | 1442 | | | | |
| 1824.75 | | | 175 | 1587 | | | | |
| 1824.50 | | | 174 | 1368 | | | | |
| 1824.25 | | | 103 | 1339 | | | | |
| 1824.00 | | | 9 | 34 | | | 2 | 921 |
| 1823.75 | 131 | 615 | | | | | | |
| 1823.50 | 183 | 923 | | | | | | |
| 1823.25 | 197 | 1076 | | | | | | |
| 1823.00 | 163 | 1122 | | | | | | |
| 1822.75 | 175 | 1025 | | | | | | |
| TOTALS: | 849 | 3838 | 612 | 5770 | | | 2 | 921 |

80.     Defendants' spoof orders increased the visible market depth (measured in contracts offered) at the best offer price by more than 2,700% compared to what was visible to market participants at that same price before Oystacher and 3 Red placed the spoof orders.

81.     After Defendants' spoof orders appeared in the order book, other market participants placed similar orders to sell at $1,824.00, as shown below at 02:01:47.271 p.m.:

| State of the Visible Order Book After Defendants' Orders 02:01:47.271 | | | | |
|---|---|---|---|---|
| **ORDER BOOK** | | | | |
| **Price** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** |
| **1825.00** | | | 151 | 1442 |
| **1824.75** | | | 175 | 1587 |
| **1824.50** | | | 174 | 1368 |
| **1824.25** | | | 104 | 1345 |
| **1824.00** | | | **32** | **998** |
| **1823.75** | **122** | **579** | | |
| **1823.50** | 182 | 922 | | |
| **1823.25** | 197 | 1076 | | |
| **1823.00** | 163 | 1122 | | |
| **1822.75** | 175 | 1025 | | |
| | | | | |
| **TOTALS:** | **839** | **4724** | **636** | **6740** |

82.     The E-Mini S&P 500 futures market at 02:01:47.561 p.m., immediately before

Oystacher and 3 Red canceled their spoof orders, looked as follows:

| State of the Visible Order Book Prior to Defendants' Cancels 02:01:47.561 | | | | |
|---|---|---|---|---|
| **ORDER BOOK** | | | | |
| **Price** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** |
| **1825.00** | | | 149 | 1439 |
| **1824.75** | | | 176 | 1590 |
| **1824.50** | | | 174 | 1368 |
| **1824.25** | | | 109 | 1381 |
| **1824.00** | | | **36** | **1008** |
| **1823.75** | **110** | **538** | | |
| **1823.50** | 182 | 922 | | |
| **1823.25** | 197 | 1076 | | |
| **1823.00** | 163 | 1122 | | |
| **1822.75** | 175 | 1025 | | |
| | | | | |
| **TOTALS:** | **827** | **4683** | **644** | **6786** |

83.     At 02:01:47.667 a.m., market data reflects that Oystacher and 3 Red canceled their two spoof orders at $1,824.00, although they had been pending for about 400 milliseconds, and had not resulted in any fills.  Market data indicates that 1 millisecond later, Defendants aggressively "flipped" and crossed the spread by placing a buy order for 264 contracts at a price of $1824.00. Because Defendants' flip order to buy would have been matched to their pending spoof orders to sell at the same price, the avoid orders that cross function in their trading platform automatically canceled their spoof orders.  In this example, Defendants, with a single button push, were once again able to almost simultaneously place a new order and cancel an existing order at the same or better price.

84.     Over the next four seconds, Defendants' aggressive flip order to buy 264 contracts was filled at a price of $1824.00.

85.     The following table illustrates Defendants' cancel and flip activity as well as the state of the Order Book at 02:01:47.669 a.m., after Defendants' flip order has been entered:

| | State of the Visible Order Book After Defendants' Cancel & Flip 02:01:47.669 | | | | Defendants' Cancel & Flip Activity 02:01:47.667 – 02:01:47.668 | | | |
| | ORDER BOOK | | | | OYSTACHER | | | |
| Price | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts |
|---|---|---|---|---|---|---|---|---|
| 1825.25 | | | 142 | 1353 | | | | |
| 1825.00 | | | 149 | 1439 | | | | |
| 1824.75 | | | 176 | 1590 | | | | |
| 1824.50 | | | 174 | 1368 | | | | |
| 1824.25 | | | 110 | 1382 | | | | |
| 1824.00 | 6 | 197 | | | 1 | 264 | ~~2~~ | ~~921~~ |
| 1823.75 | 116 | 569 | | | | | | |
| 1823.50 | 182 | 922 | | | | | | |
| 1823.25 | 197 | 1076 | | | | | | |
| 1823.00 | 163 | 1122 | | | | | | |
| TOTALS: | 664 | 3886 | 751 | 7132 | 1 | 264 | | |

86.      After Defendants' flip order was filled, the new lowest sell price was $1,824.25. Use of the spoof orders in this instance enabled Defendants to purchase 264 contracts, most at a price not previously available.  After the immediate executions triggered by their flip, Defendants now possessed a long position of 218 with resting orders to sell 3,279 contracts.  After fully executing these flip orders, Defendants held a long position of 393 contracts with resting orders to sell 3,278 contracts.

**D.      Oystacher and 3 Red Intended to Cancel their Spoof Orders Before Execution**

87.      Defendants' pattern of placing visible passive (spoof) order(s) for a large number of contracts, at or near the best bid or offer price, then simultaneously canceling them and flipping to aggressively take the other side of the market at the same or better price demonstrates their intent, at the time they placed them, to cancel these spoof orders prior to execution.

88. Defendants did not merely change their mind as to the direction of the market so quickly, so often, and with such precision, but rather intended to cancel these orders at the time they were placed.

89. Oystacher's and 3Red's intent to cancel the spoof orders before execution is further demonstrated by the difference between the fill and cancellation rates for Defendants' passive spoof orders identified in Exhibit A compared to the aggressive flip orders which followed them. The following table displays the respective fill and cancellation rates between Defendants' passive spoof orders and aggressive "flip" orders:

| Futures Contract | Mean Fill % - Spoof Orders | Mean Cancel % - Spoof Orders | Mean Fill % - Flip Orders | Mean Cancel % - Flip Orders |
|---|---|---|---|---|
| Copper | 0.89% | 99.11% | 44.30% | 55.70% |
| Crude Oil | 1.87% | 98.13% | 69.83% | 30.17% |
| Natural Gas | 0.51% | 99.49% | 50.76% | 49.24% |
| VIX | 0.94% | 99.06% | 37.53% | 62.47% |
| E-Mini S&P 500 – June 2013 | 0.17% | 99.83% | 55.20% | 37.90% |
| E-Mini S&P 500 – Dec. 2013; Jan. 2014 | 0.57% | 99.43% | 69.39% | 27.81% |

**E. Oystacher and 3 Red Employed a Manipulative and Deceptive Device or Contrivance as Part of their Spoofing Scheme in Each Futures Market**

90. Defendants' use of the avoid orders that cross function to virtually simultaneously cancel their spoof orders and flip to aggressively take the other side of the market (and trade with those induced to enter the market by the initial orders they canceled), constitutes employment of a device, scheme, artifice, or contrivance that was both deceptive and manipulative.

91.     Defendants' spoofing strategy was deceptive in that their placement and cancellation of large orders was not intended to result in the execution of these orders, but rather to create the false impression of sudden book pressure on one side of the market, so as to fraudulently induce other market participants to place orders at prices they otherwise would not have placed under regular market conditions, absent Defendants' spoofing. Their use of this strategy was manipulative in that it was intended to create the false appearance of market depth and book pressure and thereby affect the balance, number, and prices of buy and sell orders in the market in a manner to benefit Oystacher and 3 Red.

## V.    VIOLATIONS OF THE CEA

### COUNT ONE

### SPOOFING BY OYSTACHER AND 3 RED

92.     Paragraphs 1 through 91 are realleged and incorporated herein by reference.

93.     Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), makes it illegal for any person to engage in trading or conduct on a registered entity that is of the character of or commonly known to the trade as "spoofing."

94.     Oystacher and 3 Red engaged in spoofing during the relevant period by, among other things, bidding or offering with the intent to cancel the bid or offer before execution, while placing orders during the relevant period, including the following orders referenced in Exhibit A:

(a) at least 1,633 orders in the COMEX copper contract on Globex with the intent to cancel the orders before execution on December 1, 2, 5-9, 12-16, 19, and 20, 2011.

(b) at least 1,102 orders in the NYMEX crude oil contract on Globex with the intent to cancel the orders before execution, on May 7 and 9-11, 2012.

(c) at least 1,574 orders in the NYMEX natural gas contract on Globex with the intent to cancel the orders before execution, on November 30 and December 3-4, 2012.

(d) at least 284 orders in the CFE VIX contract with the intent to cancel the orders before execution, on February 19-22, 25-28 and March 1, 4-7, 11-12, 18-21, 2013.

(e) at least 614 orders in the CME E-Mini S&P 500 contract on Globex with the intent to cancel the orders before execution, on June 11 and 12, 2013, as well as December 16-19, 2013 and January 6-10, 2014.

Oystacher and 3 Red submitted and canceled these orders to create a false appearance of market depth and book pressure. Accordingly, Oystacher and 3 Red violated Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012).

95.     Each order for futures that Oystacher and 3 Red placed as part of their spoofing scheme, constitutes a separate violation of Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012).

96.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation. Because the actions of the officers, employees and agents of 3 Red, including, but not limited to Oystacher, that violated Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), were within the scope of their employment, 3 Red is liable for those acts constituting violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012).

97.     Oystacher controlled 3 Red, directly and indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of 3 Red that constitute the violations alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Oystacher is liable as a controlling person for the violations by 3 Red of Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012).

## COUNT TWO

## EMPLOYMENT OF A MANIPULATIVE AND DECEPTIVE DEVICE, SCHEME OR ARTIFICE BY OYSTACHER AND 3 RED

98.     Paragraphs 1 through 91 are realleged and incorporated herein by reference.

99.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2014), make it unlawful to employ, or attempt to use or employ any manipulative device, scheme, or artifice to defraud in connection with a contract for future delivery on a registered entity.

100.     Oystacher and 3 Red employed or attempted to use or employ a manipulative or deceptive device, scheme, or artifice to defraud, by placing passive orders for a large number of contracts on one side of the market to create the false impression of increased market depth and book pressure in order to fraudulently and manipulatively induce other market participants to place orders for contracts at price levels that they would not have placed but for the spoof orders. Oystacher and 3 Red then misused the avoid orders that cross functionality to virtually simultaneously cancel their spoof orders and flip to aggressively take the other side of the market (and trade with market participants induced to place orders similar to the spoof orders before other market participants became aware that they were spoof orders).  Defendants did this during the relevant period, including:

(a) at least 288 times in the COMEX copper market on December 1, 2, 5-9, 12-16, 19, and 20, 2011.

(b) at least 324 times in the NYMEX crude oil market on May 7 and 9-11 2012.

(c) at least 330 times in the NYMEX natural gas market on November 30 and December 3-4, 2012.

(d) at least 89 times in the CFE VIX market on February 19-22, 25-28, and March 1, 4-7, 11-12, 18-21, 2013.

(e) at least 285 times in the CME E-Mini S&P 500 market on June 11 and 12, 2013, as well as December 16-19, 2013 and January 6-10, 2014.

101.    Oystacher and 3 Red knew or recklessly disregarded that their manipulative and deceptive spoofing strategy would create the false appearance of increased market depth and book pressure, thus luring market participants to place orders based on Defendants' spoofing. Accordingly, Oystacher and 3 Red violated Section 6(c)(1) of the Act, 7 U.S.C.§ 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2014).

102.    Each time that Oystacher and 3 Red engaged in this conduct constitutes a distinct and separate violation of Section 6(c)(1) of the Act, 7 U.S.C.§ 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2014).

103.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation.  Because the actions of the officers, employees and agents of 3 Red, including, but not limited to Oystacher, that violated Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), were within the scope of their employment, 3 Red is liable for those acts constituting violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012).

104.    Oystacher controlled 3 Red, directly and indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of 3 Red that constitute the violations alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Oystacher is liable as a controlling person for the violations by 3 Red of Section 6(c)(1) of the Act, 7 U.S.C.§ 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2014).

## VI.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to the Court's own equitable powers, enter:

a)      An order finding Oystacher and 3 Red liable for violating Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C) and 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2014);

b)      An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with Defendants, from directly or indirectly:

(i)      engaging in conduct in violation of Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C) and 9(1) (2012) and Regulation 180.1, 17 C.F.R. § 180.1 (2014);

(ii)     trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § la (2012));

(iii)    entering into any transactions involving "commodity interests" (as that term is defined in Section 1.3(yy) of the Act), 7 U.S.C. § 1.3(yy) (2012)), for Defendants' own accounts or for any account in which they has a direct or indirect interest;

(iv)    having any commodity interests traded on Defendants' behalf;

(v)     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

     (vi)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

     (vii)    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014);

     (viii)   acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2014)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014);

c)     Enter an order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not to exceed the higher of $1,000,000 or triple the monetary gain to them for each violation of Section 6(c)(1) the Act and Regulation 180.1, as well as an amount not to exceed the higher of $140,000 or triple the monetary gain to them for each violation of the other provisions of the Act and regulations described herein;

d)     Enter an order providing for such other and further remedial and ancillary relief, including, but not limited to, disgorgement and trading and registration bans, as this Court may deem necessary and appropriate; and;

e)     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012).

Dated:  October 19, 2015

Respectfully submitted,


/s/ Elizabeth M. Streit_____

Elizabeth M. Streit
Chief Trial Attorney
Illinois ARDC No. 06188119

Jon J. Kramer
Senior Trial Attorney
Illinois ARDC No. 06272560

Allison V. Passman
Senior Trial Attorney
Illinois ARDC No. 06287610

Jennifer E. Smiley
Senior Trial Attorney
Illinois ARDC No. 6275940

Scott R. Williamson
Deputy Regional Counsel
Illinois ARDC No. 06191293

Rosemary Hollinger
Deputy Director
Illinois ARDC No. 03123647

U.S. Commodity Futures Trading Commission
525 W. Monroe Street, Suite 1100
Chicago, Illinois 60661

(312) 596-0537 (Streit)
(312) 596-0563 (Kramer)
(312) 596-0704 (Passman)
(312) 596-0530 (Smiley)
(312) 596-0560 (Williamson)
(312) 596-0538 (Hollinger)
(312) 596-0714 (facsimile)
estreit@cftc.gov
jkramer@cftc.gov
apassman@cftc.gov
jsmiley@cftc.gov
swilliamson@cftc.gov
rhollinger@cftc.gov