IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| U.S. COMMODITY FUTURES | ) | |
|---|---|---|
| TRADING COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-CV-9196 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| IGOR B. OYSTACHER and | ) | |
| 3 RED TRADING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff U.S. Commodity Futures Trading Commission ("the CFTC") has moved the Court to disqualify Defendants Igor B. Oystacher and 3Red Trading, LLC's ("Defendants") expert and consulting firm due to an alleged conflict of interest. [46]. Defendants have moved to retain their expert and consulting firm. [39]. For the following reasons, the Court denies the CFTC's motion and grants Defendants' motion.

# BACKGROUND

The following facts are taken from the CFTC's complaint (R. 1). The CFTC is an independent federal regulatory agency that is responsible for administering and enforcing, in part, Section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Act") and associated regulations under 17 C.F.R. §§ 1 *et seq*. (2014). (*Id*. at ¶11.) Igor B. Oystacher is the founder, President, and Chief Executive Officer of 3Red Trading LLC, a proprietary figures trading company incorporated under Delaware law and located in Chicago,

Illinois. (*Id*. at ¶12-13.) Mr. Oystacher is 3Red Trading LLC's principal trader and was its principal and majority owner. (*Id*.)

From December 2011 through at least January 2014, Defendants allegedly "intentionally and repeatedly engaged in a manipulative and deceptive spoofing scheme while placing orders for and trading futures contracts on multiple registered entities." (*Id*. at ¶2.) Specifically, the CFTC alleges that Defendants "manually plac[ed] large (at least doubling the number of contracts offered or bid at those price levels, or better) passive order(s) on one side of the market at or near the best bid or offer price, which were intended to be canceled before execution." (*Id.* at ¶3.) To complete the scheme, Defendants would then allegedly "cancel or attempt to cancel all of the spoof order(s) before they were executed and virtually simultaneously 'flip' their position from buy to sell (or vice versa) by placing at least one aggressive order on the other side of the market at the same or better price to trade with market participants that had been induced to enter the market by the spoof orders they just canceled." (*Id*.) Ultimately, the CFTC alleges that Defendants' "scheme created the appearance of false market depth that Defendants exploited to benefit their own interests, while harming other market participants" in violation of 7 U.S.C. §§ 6c(a)(5)(C), 9(1) and 17 C.F.R. §180.1. (*Id.* at ¶2, 6.)

The CFTC has moved to enjoin Defendants from trading in various markets. In support of its motion for a preliminary injunction, the CFTC heavily relies on the analysis of its expert, Professor Hendrik Bessembinder. The CFTC hired Professor Bessembinder as an expert for this case in March 2014. (R. 46 at 2.) Separate from his work in this case, on January 23, 2015, Professor Bessembinder entered an agreement with Compass Lexecon ("Lexecon"), a global economic consulting firm, to serve as a "Senior Consultant." (*Id*.)

Professor Bessembinder's contractual agreement ("the Agreement") with Lexecon provides, in relevant part:

> You [Professor Bessembinder] will serve as a Senior Consultant to Compass Lexecon. Compass Lexecon has a right of first refusal on all consulting projects you undertake. If Compass Lexecon decides that it cannot, or does not want to, take the case or project that has been offered, it will so notify you promptly and in writing. In that event, you are free to work on a case or project independently of Compass Lexecon, or to refer it to another consulting firm.
> …
> You agree that you will not at any time, except in performing your services hereunder, directly or indirectly use, disclose or publish any confidential information that you learn or become aware of, and you will not directly or indirectly use, disclose or publish any confidential information in a manner that is or may reasonably be likely to be detrimental to Compass Lexecon or any affiliate.
> …
> You agree that you will not make or publish any written or oral statements or remarks that are disparaging or deleterious to the integrity, reputation or good will of Compass Lexecon, its affiliate and management, unless such statements are made truthfully in response to a subpoena or other legal process.
>
> You acknowledge and agree that you are acting as an independent contractor and that Compass Lexecon and its affiliates shall not be responsible for payment of, and you shall not make a claim against Compass Lexecon and its affiliates for, worker's compensation, health or disability benefits, or unemployment insurance, nor shall Compass Lexecon and its affiliates be responsible for withholding or paying any employment related taxes for you, including without limitation, income and social security taxes.

(R. 46, Prof. Bessembinder-Lexecon Service Agreement, at 18-23.)

In around November 2015, Defendants informed the CFTC that they intended to engage Lexecon and its Chairman and President, Professor Daniel Fischel, as their expert consulting firm and expert, respectively. (*Id*. at 3.)

## **ANALYSIS**

The CFTC now moves this Court to disqualify Professor Fischel and Lexecon as Defendants' proposed expert and consulting firm, asserting that "Defendants should not be allowed to position an expert and firm to testify opposite Plaintiff's longstanding expert when

3

Plaintiff's expert stands in contractual privity with, and is receiving financial consideration from, Defendants' proposed experts." (*Id*. at 1-2.) Given the relevant facts, the Court disagrees.

I.      **Expert Witness Disqualification**

The CFTC contends that "fundamental fairness, the avoidance of conflict, the protection of the integrity of the adversarial process, and ensuring public confidence in the justice system warrant exclusion under the present circumstances; and the threat of unnecessary prejudice and confusion also merit exclusion[.]" (*Id*. at 1.) Specifically, the CFTC argues that "[t]he Agreement signed by Professors Bessembinder and Fischel, in his capacity as CEO of Lexecon—after the CFTC engaged Prof. Bessembinder, but before Defendants sought to engage Prof. Fischel and Prof. Lexecon [sic]—creates a situation in which these individuals and entity are too closely contractually linked to be fairly placed in positions in which they will be expected to testify and critique each other's economic and statistical analysis of Defendants' trading." (*Id*. at 7.) Given the conflict of interest, argues the CFTC, this Court must disqualify Professor Fischel and Lexecon as Defedants' expert and consulting firm, respectively.

Defendants, however, argue that no conflict exists: "The fact that Compass Lexecon and its occasional independent contractor, Professor Bessembinder, may find themselves as competing experts on opposite sides of the same case does not present a novel circumstance, let alone raise the specter of a conflict of interest." (R. 39 at 3.) Indeed, Defendants maintain that the CFTC has failed to satisfy its two-factor burden, as "there is no suggestion that the CFTC maintained a confidential relationship with Lexecon, or that the CFTC (or Professor Bessembinder) disclosed confidential information relevant to the current litigation to Lexecon." (*Id*. at 5.) Instead, Defendants conclude, the CFTC relies on "vague 'policy' and 'fairness'

4

concerns" that "cannot be enough to trump Defendants' right to a fair opportunity to present a defense." (R. 48 at 1, 3.)

"Courts have inherent authority to disqualify expert witnesses to protect the integrity of the adversary process and to promote public confidence in the legal system." *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 840 F. Supp. 2d 1072, 1083 (N.D. Ill. 2012) (citing *Lifewatch Serv., Inc. v. Braemer, Inc.*, No. 09 C 6001, 2010 WL 3909483, at *1 (N.D. Ill. Sept. 28, 2010)); *see also BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 500 F. Supp. 2d 957, 959-60 (N.D. Ill. 2007); *Chamberlain Grp., Inc. v. Interlogix, Inc.*, No. 01 C 6157, 2002 WL 653893, at *2 (N.D. Ill. April 19, 2002); *Tucker v. John R. Steele and Assocs., Inc.*, No. 93 C 1268, 1994 WL 127246, at *4, n. 3 (N.D. Ill. April 12, 1994); *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.*, 734 F. Supp. 334, 336 (N.D. Ill. 1990). Generally, "a party seeking disqualification must show that 1) a confidential relationship existed between itself and the expert and 2) it exchanged confidential information that is relevant to the litigation with the expert." *Id*. (citing *Lifewatch*, 2010 WL 3909483, at *1). Given the right of a party to select its own expert, a party seeking to disqualify an expert must meet this two-pronged test. "If both questions are answered in the affirmative, disqualification is warranted. However, if either inquiry is answered in the negative, disqualification is not appropriate." *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l., Inc.*, No. 05 C 4088, 2008 WL 4542948, at *1 (N.D. Ill. Aug. 15, 2008); *see also Allstate*, 840 F. Supp. 2d at 1083 ("The cases in which experts are disqualified are generally limited to the situation in which an expert has obtained confidential information directly form the moving party and then testifies for the opponent.") (citing *Lifewatch*, 2010 WL 3909483, at *2-3). Indeed, "there must be a substantial relationship between confidential information acquired and the matters to which the expert is expected to testify." *Allstate*, 840 F. Supp. 2d at 1083 (citing

5

*Miller v. Lenz*, No. 08 C 773, 2009 WL 3172151, at *3 (N.D. Ill. Oct. 2, 2009)). "Thus, the party seeking disqualification bears the heavy burden of showing both the existence of a confidential relationship and the transmission of confidential information, and cannot satisfy this burden by relying on 'merely conclusory or ipse dixit assertions.' " *Rosenthal Collins Grp.*, 2008 WL 4542948, at *1.

In addition to the two-part test for expert witness disqualification, some courts have adopted a third part to the test, namely, a balancing test based on policy concerns. "Where policy concerns surrounding the integrity and fairness of the adversary process are sufficient, some courts have suggested that those concerns should merit disqualification regardless of the outcome of the two-factor test[.]" *Lifewatch*, 2010 WL 3909483, at *1 (citing *Bone Care Int'l., LLC v. Pentech Pharms., Inc.*, No. 08 C 1083, 2009 WL 249386, at *1-2 (N.D. Ill. Feb. 2, 2009)). Importantly, however, "[d]isqualification of an expert is a 'drastic measure that courts should hesitate to impose except when absolutely necessary.' " *Allstate*, 840 F. Supp. 2d at 1083 (quoting *Chamberlain Grp.*, 2002 WL 653893, at *2); *see also Rosenthal Collins Grp.,* 2008 WL 4542948, at *1. Although, " '[t]he court has an interest in preventing conflicts of interest and maintaining judicial integrity[,] . . . experts should be allowed to pursue their trade, and parties should be permitted to select their own experts.' " *Id*. (quoting *Chamberlain Grp.*, 2002 WL 653893, at *4.)

**II.    "Policy Concerns" Do Not Warrant Disqualification Of Defendants' Expert**

The CFTC admits that it does not satisfy the traditional two-factor expert disqualification test. Specifically, the CFTC does not contend that a conflicting confidential relationship existed or that anyone transmitted confidential information. (R. 46 at 1, n. 1 ("Plaintiff does not believe or contend that Defendants' proposed expert witness (Prof. Dan Fischel), Defendants' proposed

expert consulting firm (Compass Lexecon), or Plaintiff's previously engaged expert witness (Prof. Hendrik Bessembinder) have engaged in any unethical or inappropriate conduct with respect to any matter asserted here.").) Instead, the CFTC relies entirely on the "policy concerns" that some courts have held trump the two-factor test. (*Id*. at 7 ("While Plaintiff has no reason to believe that Prof. Fischel or Lexecon have obtained any information confidential to the Plaintiff, policy concerns warrant disqualification here.").) Accordingly, the Court's analysis hinges on whether the Agreement threatens the "integrity and fairness of the adversary process" enough to warrant disqualification of Defendants' chosen expert and consulting firm. *Lifewatch*, 2010 WL 3909483, at *1 (citation omitted). It does not.

The Agreement presents no reasonable conflict-induced limitations on the experts' abilities to fulfill their role. Professor Bessembinder has agreed to work as a "Senior Consultant" independent contractor for Lexecon, not as a full-time employee. As a non-employee, Professor Bessembinder is able to engage in cases outside of Lexecon. Indeed, the Agreement's "Right of First Refusal" clause envisioned as much: "If Compass Lexecon decides that it cannot, or does not want to, take the case or project that has been offered, it will so notify you promptly and in writing. In that event, you are free to work on a case or project independently of Compass Lexecon." Further, Professor Bessembinder's "Non-Disparagement" clause is excepted in the event he makes "statements [that] are made truthfully in response to a subpoena or other legal process," such as presenting expert testimony in a federal civil case. Thus, Professor Bessembinder faces no contractual restrictions to his expert role, regardless of whether it is opposite another Lexecon expert. As a result, the Agreement does not create a disincentive sufficient to warrant the "drastic measure" of expert disqualification. *Allstate*, 840 F. Supp. 2d at 1083.

7

Defendants' expert, Professor Fischel, affirmed as much in his affidavit. Importantly, Professor Fischel states that "[a]t no point has Professor Bessembinder ever had any discussions with me or anyone else from Compass Lexecon about the case, nor have I or anyone else at Compass Lexecon ever had any discussions or received any information or materials from the CFTC about the case." (R. 48-1, Professor Daniel Fischel Aff., at ¶8.) Furthermore, Professor Fischel avers that the current factual framework and Agreement is a common occurrence: "In our history and currently, it is routine for situations to arise where our academic affiliates are contacted in matters where we have a conflict or otherwise do not wish to pursue the engagement, and therefore decline to exercise our right of first refusal. In these situations, our affiliates are free to accept such engagements, including as expert witnesses where we are acting as expert witnesses on behalf of opposing clients in the same litigation." (*Id*. at ¶4.) Moreover, the experts have already jointly made arrangements to alleviate concerns of performance-hindrances or confidential-information-transmission:

> In order to maintain the separation that already exists between the CFTC and Compass Lexecon, and to protect Professor Bessembinder from the possibility of losing any matters where the CFTC would not want to go forward with him if he were limited to using Compass Lexecon for support, Professor Bessembinder and I have agreed that while the current 3Red matter is pending, if he is contacted by the CFTC to provide potential expert services, Compass Lexecon will suspend any right of first refusal obligation that it would otherwise be owed under its contract with Professor Bessembinder. This arrangement also ensures that Compass Lexecon will not receive any confidential information from the CFTC on any matter, whether or not it bears any relationship to this 3Red matter.

(*Id*. at ¶9.) At the very least, this joint expert proposal cuts against the CFTC's speculative argument that its expert "could be laboring under a concern about retaliation in terms of future assignments" at Lexecon. (R. 46 at 8.)

The CFTC's reliance on various Northern District of Illinois cases in its effort to convince the Court otherwise is misplaced. Indeed, these cases either present factual scenarios

8

far more "drastic" than what the Court faces today or explicitly caution courts to generally adhere to the two-factor test. *Allstate*, 840 F. Supp. 2d at 1083. In *Am. Empire Surplus Lines Ins. Co. v. Care Centers, Inc.*, for example, the court disqualified the expert when the expert testified both for and against the same party in subsequent, related litigation. 484 F. Supp. 2d 855, 857 (N.D. Ill. 2007) ("It simply appears unfair and unseemly to allow an expert to be used in such a way."). Naturally, the expert's "switch" evoked concerns about experts manipulating their findings and, as a result, cast suspicion upon experts and judicial integrity as a whole. Further, in *Simons v. Freeport Memorial Hosp.*, the court disqualified an expert after the expert performed work for both the plaintiff and defendant during the same litigation. No. 06 C 50134, 2008 WL 5111157, at *5 (N.D. Ill. Dec. 4, 2008) ("Courts have most readily disqualified experts where, as here, the expert switched sides in the same litigation."). Similar to *American Empire*, this "switch" was antithetical to judicial integrity and the appearance of fairness. Moreover, although the court in *Allstate* admitted that "some cases" have allowed policy concerns to trump the traditional two-factor test, it, ultimately, did not join that contingent. 840 F. Supp. 2d at 1078. The court faced an expert that testified opposite the same defendant in two separate cases, the first of which involved confidential information and was subject to a binding arbitration agreement. Holding that the expert "had not 'switched sides,' " however, the court concluded that the policy of "allowing experts to practice their craft" outweighed the fear of any "conflicts of interest." *Id*. at 1083-84. Indeed, the court concluded that the movant failed to carry "the heavy burden required to justify the extreme sanction of expert disqualification." *Id*. at 1084. Finally, in *Paul v. Rawlings Sporting Goods Co.*, the court admonished other courts to generally limit expert disqualification to the aforementioned two-factor test:

> Stating each proposition negatively, if any disclosures of privileged or
> confidential material were undertaken without a reasonable expectation that they

9

would be so maintained (so that, in effect, any confidentiality or privilege relating to the matters communicated was waived), or if, despite the existence of a relationship conducive to such disclosures, no disclosures of any significance were made, it would seem inappropriate for the court to dictate to the expert or his new employer that his participation in the case be limited or eliminated.

123 F.R.D. 271, 278 (S.D. Ohio 1988).

The Court is not persuaded by the CFTC's conflict argument. The CFTC states that, "[t]he contractual terms binding Prof. Bessembinder to Prof. Fischel and Lexecon . . . certainly present the Court with a situation where the interests of these parties have been closely intertwined in a manner which poses both the appearance and risk of conflict of interest." (R. 46 at 7-8.) Specifically, the CFTC is concerned that the Agreement "appears to pose the risk of adversely impacting the assistance Plaintiff's expert can provide in analyzing the weaknesses in an opposing expert report." (*Id*. at 8.) As illustrated in more detail above, however, the Agreement presents no such risk. Consequently, the present factual scenario falls far from the side-switching scenarios most courts have found troubling enough to warrant the "extreme sanction" of expert disqualification. *Allstate*, 840 F. Supp. 2d at 1084.

Instead, the CFTC's argument resembles an argument to disqualify opposing attorneys at the same law firm.[1] Courts, however, treat experts from the same firm differently than attorneys from the same firm. Specifically, parties moving to disqualify experts on the basis of policy face a higher burden than those moving to disqualify attorneys. "The majority of courts dealing with this issue have held that the standard for expert disqualification differs from that of attorney disqualification because experts are not advocates in the litigation but sources of information and opinions." *BP Amoco*, 500 F. Supp. 2d at 960 (quotation marks and citations omitted); *see also*

---

[1] For the reasons described in more detail above, the Court disagrees with the CFTC's contention that "the contractual provisions that bind Prof. Bessembinder to Lexecon are much more significant than just 'working for the same firm[.]'" (R. 46 at 10, n. 6.) Indeed, the contractual terms provide the two experts the flexibility to testify on opposite sides free from the CFTC's alleged limitations.

10

*Great Lakes Dredge & Dock*, 734 F. Supp. at 338 (refusing to apply attorney-client privilege principles that preserve "public trust in the integrity of the judicial system," because "[t]he attorney stands in a higher position of trust with its related fiduciary duties to the client than does an expert. . . . Experts perform very different functions in litigation than do attorneys."); *Chamberlain Grp.*, 2002 WL 653893, at *2. *Paul*, on which the CFTC relies, concluded the same. 123 F.R.D. at 280-81 (increasing the burden to disqualify experts relative to attorneys by refusing to apply attorney-client confidentiality presumptions, because "there is less stigma attached to an expert 'changing sides' in the midst of litigation than an attorney, who occupies a position of higher trust, with concomitant fiduciary duties, to a client than does an expert consultant."). Indeed, if "experts are too easily the subject of motions to disqualify, unscrupulous attorneys or clients will be encouraged to engage in a race for expert witnesses, and to identify potentially harmful experts and to create some type of inexpensive relationship with those experts, simply in order to keep them away from the other side."[2] *Id*. at 281-82. Given that experts play more of an educational, rather than advocacy, role, "courts have refused to impute a conflict of interest on other members of an expert's firm, choosing instead to apply safeguards such as screens to prevent the transmission of confidential information." *BP Amoco*, 500 F. Supp. 2d at 960 (citing *Viskase Corp. v. W.R. Grace & Co.-Conn.*, No. 90 C 7515, 1992 WL 13679 (N.D. Ill. Jan. 24, 1992)). Accordingly, movants must show more than merely an expert-employment-connection for "policy concerns" to satisfy its "heavy burden"—especially when one expert is a non-employee, independent contractor as in this case. *Allstate*, 840 F. Supp. 2d at 1084. The CFTC has failed to do so.

---

[2] Although neither side alleges that a party has acted in such a manner, the policy concern still remains at the forefront of the Court's analysis.

Despite the CFTC's arguments to the contrary, the Court agrees with the reasoning found in *Great Lakes Dredge & Dock*. Facing opposing experts working for the same employer, the court held:

> In the instant case, neither party has retained an expert that has worked or been associated with the opposing side. Neither party alleges it has disclosed confidential or privileged information to the opposing side's expert. . . . [Plaintiff's expert] does not state that he did his work for [Plaintiff] through [experts' mutual employer] or that he ever discussed his work on the [case] with his co-workers at [experts' mutual employer], including [opposing expert]. [Opposing expert] in his affidavit denies any knowledge of [Plaintiff's expert's] work for [Plaintiff] . . . There appears to have been no communication or "leakage" whatsoever of any information . . . There is no relationship between [Plaintiff] and [opposing expert] or [Plaintiff] and [expert's mutual employer]. . . . It is [Plaintiff's expert] who owes a duty to [Plaintiff] not to disclose [Plaintiff's] confidences or his work product on their behalf to his coworkers at [experts' mutual employer]. Similarly, it is [opposing expert] and [experts' mutual employer] who owe a duty not to disclose [Third Party Defendant's] confidential or privileged information to [Plaintiff's expert]. However, [Third Party Defendant] knows of the fact that [Plaintiff's expert] works at [experts' mutual employer] and apparently is willing to rely on [opposing expert] and [experts' mutual employer] to take appropriate steps to protect its interests in the litigation. Additionally, as discussed in *Paul*, it is primarily the duty of each side's attorneys to take necessary steps to prevent possible future disclosures of their clients' confidential or privileged information. The court refuses to disqualify [opposing expert] or [experts' mutual employer] at this time.

*Great Lakes Dredge & Dock*, 734 F. Supp. at 338-39 (citing *Paul*, 123 F.R.D. at 279).

Disqualifying an expert is a "drastic measure," and courts have previously employed such power only "when absolutely necessary." *Allstate*, 840 F. Supp. 2d at 1083 (citation omitted). Failing to allege any confidential relationship or communication transmission, the CFTC's "heavy burden" becomes heavier. *Id*. at 1084. Moreover, positing that the Agreement creates "the appearance that Plaintiff's expert could be laboring under a concern about retaliation in terms of future assignments [at Lexecon]" (R. 46 at 8) and "has the potential to undermine public confidence in the adjudication of this case" (*Id*. at 9) amounts to nothing more than "merely conclusory or ipse dixit assertions." *Rosenthal Collins Grp.*, 2008 WL 4542948, at *1 (quotation

marks and citation omitted).  The CFTC has not satisfied its burden.  As a result, the Court denies the CFTC's motion and grants Defendants' request to retain Compass Lexecon as their expert consulting firm and Professor Daniel Fischel as their expert in this case.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to disqualify Defendants' expert and consulting firm and grants Defendants' motion to retain them.

DATED:  December 18, 2015                               ENTERED

                                                              AMY J. ST. EVE
                                                              United States District Court Judge