**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| U.S. COMMODITY FUTURES TRADING COMMISSION, | : | CIVIL ACTION NO. 15-cv-09196 |
| | : | |
| PLAINTIFF, | : | Hon. Amy J. St. Eve |
| | : | |
| v. | : | |
| | : | |
| IGOR B. OYSTACHER and 3 RED TRADING LLC, | : | |
| | : | |
| DEFENDANTS. | : | |
| | : | |
| | : | |
| | : | |

## SUPPLEMENTAL REPORT OF DANIEL R. FISCHEL

### I.    INTRODUCTION, ASSIGNMENT AND SUMMARY OF CONCLUSIONS

1.    I submitted my initial report in this matter on February 26, 2016.[1]  Among other things, my initial report reviewed and evaluated the analysis and conclusions of the Bessembinder Report, which concerns Mr. Oystacher's trading activity in five futures products on 60 trading days during the period from December 2011 through May 4, 2015.[2]

2.    On March 11, 2016, Professor Bessembinder submitted a rebuttal report that "respond[s] to the reports filed in this matter by [me] and Jerry W. Markham" and "also …

---

1.  See Report of Daniel R. Fischel, February 26, 2016 (the "Fischel Report").
2.  Id., ¶¶ 4-9.  Unless otherwise indicated, the capitalized terms in this supplemental report are defined as provided in the Fischel Report.

- 2 -

evaluate[s] data regarding Mr. Oystacher's trading on February 1 and 2, 2016 in the CME 10-Year Treasury Note futures contract."[3]  While Professor Bessembinder concedes that "[t]he February 2016 data revealed some changes in Mr. Oystacher's behavior compared to the examined dates in [his] original report," Professor Bessembinder nevertheless opines that the "data continues to support the conclusion that Mr. Oystacher entered cancel-side orders with intent to spoof."[4]

        3.      Professor Bessembinder's opinion that Mr. Oystacher acted "with intent to spoof" and "without the intention to complete trades" when he placed his cancel-side orders for the CME 10-Year Treasury Note futures contract ("Treasury Note Futures" or "the Treasury Note Futures contract") is not based on any direct evidence of Mr. Oystacher's intent (such as potentially could be found in a trading algorithm, contemporaneous documents, or oral admissions) or on any recognized methodology for detecting "intent to spoof."  Rather, Professor Bessembinder bases his conclusion on various statistical analyses of his own invention that he asserts "shed light" on what Mr. Oystacher's intent was at the time he entered his cancel-side orders, even when the results of these analyses do not comport with his prior findings concerning the other five futures products.  Thus Professor Bessembinder necessarily rejects, either explicitly or implicitly, the alternative hypothesis that Mr. Oystacher intended to trade his cancel-side orders when those orders were entered, but that changes in market conditions, information learned from the reactions of other traders, or information learned from developments in other markets after the cancel-side orders were placed caused Mr. Oystacher to

---

3.  Hendrik Bessembinder, Rebuttal to the reports of Daniel R. Fischel and Jerry W. Markham, March 11, 2016 ("Bessembinder Rebuttal"), ¶ 1.
4.  Bessembinder Rebuttal, ¶¶ 72 & 93.  Professor Bessembinder uses the term "spoof" to refer "to the entry of orders without the intention to complete trades on those orders." Id., ¶ 5.

place the trade-side orders that resulted in the cancellation of his cancel-side orders (i.e., the Not Spoofing Hypothesis).

    4.    I have been asked by counsel for the Defendants to review and evaluate Professor Bessembinder's analysis and conclusions concerning Treasury Note Futures.[5] In performing this assignment, I have received assistance from the professional staff of Compass Lexecon. Appendix A identifies the additional materials we relied upon in compiling this report. As a result of our work, I have concluded that many of Professor Bessembinder's analyses of the data concerning the Treasury Note Futures contract are flawed and that the data, properly analyzed, not only does not establish that Mr. Oystacher's cancel-side orders were "spoof orders" entered without intent to execute trades (as Professor Bessembinder claims), but also are more consistent with the Not Spoofing Hypothesis than the Spoofing Hypothesis. In particular:

- Even though Mr. Oystacher ranked 5th in contracts entered and 3rd in contracts traded, Mr. Oystacher ranked only 24th in the number of flip events, as compared with all other traders.[6] In other words, Mr. Oystacher's flip activity (as measured by the number of flip events) was relatively low compared with his overall trading activity. Moreover, Mr. Oystacher's 53 flip events constituted less than one percent of all Treasury Note Futures flip events on the examined dates in February 2016. The 7,709 flips by other traders implies that that there frequently were changes in market conditions, information or objectives sufficient to cause a trader to reverse his desired direction of trade at the event price, which is consistent with the Not Spoofing Hypothesis.

- Only two of Mr. Oystacher's 53 flip events contain cancel-side orders that meet the "narrowing criteria" that Professor Binder claims provide the strongest "indications of spoofing intent." Moreover, many of the other traders' flip events include cancel-side orders that satisfy Professor Bessembinder's narrowing criteria, which casts doubt on Professor Bessembinder's claim that the narrowing

---

5.  I understand that the Court's scheduling order does not provide an opportunity for me to submit a reply to portions of the Bessembinder Rebuttal that respond to the Fischel Report. Accordingly, this rebuttal report only addresses the portions of the Bessembinder Rebuttal that pertain to the Treasury Note Futures contract.

6.  A flip or flip event is "defined as the cancelation of one or more orders (cancel side of flip) and the essentially simultaneous entry of one or more opposite-direction orders (trade side of flips) at the same price or a more aggressive (higher for newly entered buy orders or lower for newly entered sell orders) price." Id., ¶ 6.

criteria can be used to identify cancel-side orders placed with spoofing intent, and instead suggests that cancel-side orders with these characteristics are consistent with the Not Spoofing Hypothesis.

- Professor Bessembinder's analysis of "Mr. Oystacher's order entry behavior in the seconds before his flips" is fundamentally flawed due to both a selection bias (because Professor Bessembinder limited his analysis to the subset of Mr. Oystacher's orders that were placed just before flip events) and an aggregation bias (because Professor Bessembinder analyzed aggregate data, not separate data for each flip event). A comprehensive analysis of Mr. Oystacher's order entry behavior shows that Mr. Oystacher often placed large imbalanced orders that he did not cancel quickly (i.e., within one or five seconds), which is contrary to Professor Bessembinder's conclusion that Mr. Oystacher's large imbalanced orders were entered with the intent to spoof, but is consistent with the Not Spoofing Hypothesis. An analysis of disaggregate data shows that there is no systematic pattern of "accelerated order entry" in the five second interval before flips.

- All of the characteristics of Mr. Oystacher's flip events (including execution rates, order sizes, personal order imbalances, and Iceberg order usage) are consistent with the Not Spoofing Hypothesis. In particular, Mr. Oystacher's trade-side orders had relatively high execution rates as compared to his cancel-side orders because his trade-side orders were marketable orders and because Mr. Oystacher left his trade-side orders open for relatively long periods of time, on average. By leaving those orders open, Mr. Oystacher indicated that he believed he would be able to obtain additional fills, which is not consistent with the claim that Mr. Oystacher thought he needed to enter "spoof orders" in order to get his trade-side orders filled.

- Professor Bessembinder does not establish that Mr. Oystacher's cancel-side orders for Treasury Note Futures "led to changes in market conditions" that "would on average benefit a spoofing strategy" and (unlike his analysis of the other relevant products) finds no statistically significant evidence that such changes occurred. Moreover, the data show that there were frequently other changes in market conditions between the times Mr. Oystacher entered his cancel-side orders and the times he entered his trade-side orders, which may have caused Mr. Oystacher to change his desired direction of trade at the event price, consistent with the Not Spoofing Hypothesis.

I elaborate upon and provide the bases for these conclusions in the remainder of this report.

II.    **MR. OYSTACHER'S TRADING ACTIVITY IN THE TREASURY NOTE FUTURES CONTRACT IN FEBRUARY 2016 IS CONSISTENT WITH THE NOT SPOOFING HYPOTHESIS**

5.      In my initial report, I demonstrated that order cancellations are common and that Mr. Oystacher cancelled a smaller percentage of the contracts in the relevant products than other traders cancelled on the examined days.[7]  The same finding holds for Treasury Note Futures on the examined days in February 2016 as the data show that Mr. Oystacher cancelled 77.4 percent of his orders as measured by contracts entered, whereas the 198 other traders that Professor Bessembinder analyzed cancelled 81.7 percent of their orders as measured by contracts entered.[8]

6.      I also demonstrated in my initial report that it is not unusual for orders to be cancelled within one second of entry, and that Mr. Oystacher's percentage of order cancellations within one second was lower than average for each of the relevant products on the examined days.[9]  This finding also holds for Treasury Note Futures on the examined days in 2016, as the data show that 3.9 percent of Mr. Oystacher's order cancellations occurred within one second, whereas the 198 other traders that Professor Bessembinder analyzed cancelled 40.6 percent of their orders within one second.

7.      Professor Bessembinder's focus is not on order cancellations per se, but on cancellations that occur in flip events.  The Spoofing Hypothesis and the Not Spoofing

---

7.  Fischel Report, ¶ 12.
8.  See Bessembinder Rebuttal, Table 1, Panel I.  As in the Fischel Report, the cancellation percentage is calculated as (Contracts Entered – Contracts Traded) as a percentage of Contracts Entered.  Professor Bessembinder analyzed the 198 other traders with flip events.  (Bessembinder Rebuttal Report, Table 1 reports that there are 199 other traders with flip events, but this appears to be a typographical error as the intermediate data sets Professor Bessembinder's programs produce show 198.)  Id.  Most of the 5,721 accounts (excluding Mr. Oystacher's account) that traded on the examined dates did not engage in flips, but these 198 traders were far more active than most other traders, as the contracts entered by these 198 traders constituted 48.9 percent of the total contracts entered by all traders other than Mr. Oystacher.  (Bessembinder Rebuttal, ¶ 75 reports that there are 5,724 other traders, but this also appears to be a typographical error as the data show there be 5,721 other traders.)
9.  Fischel Report, ¶ 13.

Hypothesis provide two alternative explanations for flips. The Spoofing Hypothesis "presumes that the spoofer has a genuine desire to trade in a given direction (the direction of the trade-side orders in this case)" and that "[t]he goal of the spoof orders [i.e., the cancel-side orders] is to attract additional orders to the spoof side, so that the trade side orders can receive improved execution rates and/or prices for trades that the spoofer does want to execute."[10] In contrast, the Not Spoofing Hypothesis posits that a trader has a genuine desire to trade in the direction of his cancel-side orders when he enters those orders, but subsequent changes in information, circumstances or objectives cause the trader to reverse his desired direction of trade at the event price of the cancel-side orders and place trade-side orders at that price (or a better price). Therefore, as Professor Bessembinder recognizes, "[n]ot all flips are necessarily part of a spoofing strategy...."[11]

8.     Professor Bessembinder claims that "[t]he most recent data continues to support the conclusion that Mr. Oystacher entered cancel-side orders with intent to spoof."[12] However, I demonstrate below that to the extent that the data allow for any inference concerning intent, the data is more consistent with the Not Spoofing Hypothesis.

### A. The Frequency of Mr. Oystacher's Flipping Activity and the Size of His Flip Orders are Consistent with the Not Spoofing Hypothesis

9.     Bessembinder Rebuttal, Table 1, Panel I contains results concerning the "Frequency of Flips and Activity Associated with Flips" for Mr. Oystacher and other traders with flip events that parallel the results contained in Bessembinder Report, Table 1, Panels A to H.[13] Professor Bessembinder states that "the results indicate that Mr. Oystacher continued to flip

---

10. Bessembinder Rebuttal, ¶ 36.
11. Id., ¶ 6.
12. Id., ¶ 93.
13. Id., ¶ 74.

frequently on the examined dates, engaging in 53 flips."[14]  However, the data show that Mr. Oystacher ranked 24[th] in the frequency of flip events (with 53 flip events), even though Mr. Oystacher ranked 5[th] in the number of contracts entered and 3[rd] in the number of contracts traded. In other words, Mr. Oystacher's flip activity as measured by the number of flip events was low relative to his overall trading activity.  Moreover, Mr. Oystacher's 53 flip events constituted less than one percent of the 7,762 flip events in the Treasury Note Futures contract on the examined dates in February 2016.  The 7,709 flip events by other traders implies that there were frequently changes in market conditions that would cause a trader to reverse his desired direction of trade at the event price, which is consistent with the Not Spoofing Hypothesis.[15]

       10.      With respect to the "Activity Associated with Flips," Professor Bessembinder notes that Mr. Oystacher ranked 1st in four categories (i.e., contracts cancelled in flips, contracts entered on the trade side of flips, contracts executed on the orders entered on the trade side of flips, and the percentage of contracts traded attributable to orders entered on the trade side of flips) and opines that "the data in Table 1 Panel I supports the conclusion that on the two examined dates in February 2016, Mr. Oystacher engaged in flipping activity on a larger scale, and relied on trade-side flip orders to execute his trades to a greater extent, as compared to any of the 5,724 other accounts active in the 10-Year Treasury Note futures on those dates."[16] But Professor Bessembinder's findings concerning activity associated with flips are attributable to the relatively large average size of Mr. Oystacher's orders as compared with the average size

---

14. Id., ¶ 74.

15. Professor Bessembinder states that "it is possible that some other traders were also engaged in spoofing strategies when they flipped" but also states that "most of the other traders who engaged in flip events did so on a much smaller scale than Mr. Oystacher," and "relatively small quantities on the cancel side have little effect on the observable imbalance in the limit order book, are less likely to lure other traders into responding, [and] are less likely to be effective as part of a spoofing strategy."  Id., ¶ 23.  Therefore, the number of flip events involving other traders is a good indicator of the frequency of changes in market conditions that were sufficient to cause a trader to reverse his desired direction of trade at a particular price.

16. Id., ¶¶ 74-75.

of other traders' orders, not the frequency of his flip events (which, as shown above, was relatively low). In particular, Mr. Oystacher's cancel-side orders were approximately 30 times larger than the cancel-side orders placed by other traders, on average.[17] Even though Mr. Oystacher's cancel-side orders were relatively large as compared with the average size of other traders' cancel-side orders, however, Mr. Oystacher's cancel-side orders were <u>not</u> unusually large when compared with Mr. Oystacher's non-flip orders or his trade-side orders.[18] Thus, Professor Bessembinder's observations concerning comparative "Activity Associated with Flips" do not establish that Mr. Oystacher placed his cancel-side orders without the intention to trade those orders and with the "intent to spoof."

### B. <u>Mr. Oystacher's Order Entry Behavior is Consistent with the Not Spoofing Hypothesis</u>

11. In Table 2 of his initial report, Professor Bessembinder purported "[t]o assess which hypothesis regarding Mr. Oystacher's intent at the time he placed his cancel-side orders is supported by the data" by analyzing "whether Mr. Oystacher altered his order placements in advance of his flips" by accelerating his rate of order entry and reducing his rate of Iceberg usage.[19] Bessembinder Rebuttal, Table 2, Panel I contains the results of this analysis for the Treasury Note Futures contract on the examined dates in February 2016.[20] Professor Bessembinder concludes as follows:

> The results for 10-Year Treasury Note futures no longer indicate that Mr. Oystacher engages in sharp acceleration in order entry on the cancel side in the

---

17. <u>Id.</u>, Table 1, Panel I. Average size per flip event is calculated by dividing the number of contracts by the number of flip events. Mr. Oystacher's trade-side orders were approximately 53 times larger than the trade-side orders entered by other traders, on average; and the number of contracts that Mr. Oystacher traded on his trade-side orders was approximately 63 times larger than the contracts traded by other traders with flips on their trade-side orders, on average. <u>Id.</u>

18. <u>Id.</u>, Table 4, Panel I, row [1] (showing that Mr. Oystacher's average cancel-side order was smaller than his average non-flip order and his average trade-side order).

19. Bessembinder Report, ¶ 37-40.

20. Bessembinder Rebuttal, ¶ 76.

> final few seconds before his flips, and the last second in particular does not stand out relative to the immediately preceding seconds. Nor do the data in Table 2, Panel I indicate that Mr. Oystacher's rate of Iceberg usage on the cancel side declined dramatically in the last second before his flips, as compared to the immediately preceding seconds. In contrast to results for the examined dates in my original report, which showed that Mr. Oystacher accelerated his order entry on the cancel side in the last few seconds before his flips, the results for 10-Year Treasury Note futures in February 2016 show that Mr. Oystacher's order entry within the final five seconds before his flips was relatively smooth.[21]

In other words, Professor Bessembinder's findings for Treasury Note Futures based on his own proposed test are more consistent with the Not Spoofing Hypothesis than the Spoofing Hypothesis.

        12.    Professor Bessembinder opines that these "observation[s] notwithstanding, the data continues to support the conclusion that Mr. Oystacher created large imbalances in the observable limit order book prior to his flips."[22] But the Spoofing Hypothesis requires more than just the placement of imbalanced orders: it also posits that the "[t]he goal of the spoof orders is to attract additional orders to the spoof side, so that the trade side orders can receive improved execution rates and/or prices for trades that the spoofer does want to execute."[23] Professor Bessembinder's analysis of order entry behavior is fundamentally flawed because he limited his analysis to the subset of Mr. Oystacher's orders that were placed immediately prior to flip events, and did not consider whether or how frequently Mr. Oystacher placed imbalanced orders at other times.[24] As is demonstrated below, Mr. Oystacher often placed large, imbalanced orders on one side of the market but did <u>not</u> cancel these orders in flips within one second. This finding implies that Mr. Oystacher had other reasons for placing imbalanced orders and, therefore, is more consistent with the Not Spoofing Hypothesis than the Spoofing Hypothesis.

---

21. Id., ¶ 76-77.
22. <u>Id.</u>, ¶ 77.
23. <u>Id.</u>, ¶ 5.
24. This type of error is commonly referred to in the literature as a "selection bias."

- 10 -

13.    We analyzed Mr. Oystacher's orders in each second that he placed orders.  In order to measure order imbalances, we calculated the absolute value of the difference between the contracts entered by Mr. Oystacher on the buy and sell sides of the market in each second, exclusive of any trade-side flip orders.  We then selected the quintile of seconds with the largest order imbalances and analyzed whether any of the orders on the side of the market with more contracts entered were cancelled in a flip within one second (i.e., in the second the orders were placed or in the next second).  We found that for the largest quintile, the flip frequency was *zero*.  In other words, no flips occurred in the one second after Mr. Oystacher entered his most imbalanced orders.[25]

14.    For completeness, we conducted the same analysis on Mr. Oystacher's largest imbalances for each of the other relevant products on the examined dates.  The table below reports the flip frequency for the quintile of seconds with the largest order imbalances for each product, as well as the estimated price volatility of each product on the examined dates.

### Comparison of Mr. Oystacher's Flip Frequency and Price Volatility for the Relevant Products

| Contract | Flip Frequency | Price Volatility [1] |
|---|---|---|
| Crude Oil | 55.6% | 11.07 |
| Copper | 34.6% | 8.62 |
| Natural Gas | 39.9% | 5.81 |
| Treasuries | 0.0% | 1.96 |
| VIX | 10.4% | 1.45 |
| E-Mini, 6/2013 | 11.0% | 4.62 |
| E-Mini, 12/2013 & 1/2014 | 15.7% | 3.90 |
| E-Mini, 9/2014 | 9.2% | 4.23 |

---

25. We also performed an analysis using five second intervals instead of one second intervals and found that the flip frequency in the largest quintile was 0.7 percent.

| E-Mini, 4/2015 & 5/2015 | 13.6% | 4.23 |
|---|---|---|

Notes:
[1] Price volatility is measured as the standard deviation of five minute price changes measured in ticks, using data for the period 6 am and 4 pm CST. Price is estimated as the average of the best bid and best offer at each point in time.
[2] The correlation between flip frequency and price volatility is 0.91 and is statistically significant at the 1% level.

As the table shows, the flip frequencies for Mr. Oystacher's most imbalanced orders range from 0.0 percent (for Treasury Note Futures) to 55.6 percent (for Crude Oil). In other words, the frequency of <u>not</u> flipping ranged from 44.4 percent (for Crude Oil) to 100 percent (for Treasury Note Futures). Thus, Mr. Oystacher's trading activity after he entered his most imbalanced orders is not consistent with the hypothesis that "the orders were entered by Mr. Oystacher with the intent that they be cancelled" as Professor Bessembinder claims, but is consistent with the Not Spoofing Hypothesis.

15.    The table also shows that there is a statistically significant positive correlation between Mr. Oystacher's flip frequency and price volatility. In other words, Mr. Oystacher's flip frequency is generally higher in more volatile markets. This finding strongly supports the Not Spoofing Hypothesis because higher price volatility would be expected to increase the likelihood that Mr. Oystacher's desired direction of trade at the event price would change after he entered his cancel-side orders.

**Table 2 Extended**

16.    Because Professor Bessembinder's analysis of Treasury Note Futures on the examined dates did not show that Mr. Oystacher accelerated his order entry on the cancel side just before his flips, Professor Bessembinder "broaden[ed] the time horizon to consider Mr. Oystacher's order entries in the thirty seconds prior to each

flip, rather than limiting [his] analysis to ten seconds as in [his] original report."[26]

Professor Bessembinder claims that "[t]he results, reported in Table 2, Extended Panel I"

show that "Mr. Oystacher did accelerate his order entry on the cancel side ahead of his

flips" purportedly because the table shows that "his rate of order entry per five seconds

on the cancel side increased from 0.54 when the flip was 26 to 30 seconds away to 1.18

when the flip was 6 to 10 seconds away, and to 1.98 during the final five seconds."[27]

       17.     Professor Bessembinder's analysis of the broadened data in

Bessembinder Report, Table 2 Extended, Panel I is fundamentally flawed because the

averages reported in that table are driven by the distribution of enter-to-flip times for

cancel-side orders <u>across</u> flip events, not Mr. Oystacher's behavior before any particular

flip event.[28] To demonstrate this, we analyzed each of the 53 flip events separately, as

shown in Appendix B. For each flip event, Appendix B reports the number of event-

related cancel-side orders in each five second interval (or "bucket").[29] The number of

such orders in each bucket is then used to place each flip event into one of three

categories: (i) a flip event is classified as "Only 1-5" if all of the event-related cancel-

side orders are in the 1-5 second bucket, (ii) a flip event is classified as "Not

Accelerated" if the number of event-related cancel-side orders in the 1-5 second bucket is

<u>not</u> greater than the number of event-related cancel-side orders in at least one of the other

buckets, and (iii) a flip event is classified as "Accelerated" if the number of event-related

cancel-side orders in the 1-5 second bucket is greater than the number of event-related

---

26. <u>Id.</u>, ¶ 78.
27. <u>Id.</u> ¶ 79.
28. The incorrect assumption that what is true about a group is also true about individual members of the group is commonly referred to in the literature as the fallacy of aggregation or the ecological fallacy.
29. The event-related cancel-side orders are the cancel-side orders entered before the flip event but after any previous flip event.

cancel-side orders in any of the other buckets. As Appendix B shows, 5 (9.4 percent) of the 53 flip events are Only 1-5, 41 (77.4 percent) of the 53 flip events are Not Accelerated, and only seven (i.e., 13.2 percent) of the 53 flip events are Accelerated.[30] These data contradict Professor Bessembinder's claim that Mr. Oystacher typically accelerated his order entry before flip events.

18.     Appendix B also shows that when the data are pooled across flip events, there are more cancel-side orders in the 1-5 second bucket than any other bucket, even though there is no systematic pattern of accelerated order entry before flip events. This result demonstrates that the apparent acceleration of order entry in the pooled data reported in Bessembinder Report, Table 2 Extended, Panel I is driven by the distribution of enter-to-flip times for cancel-side orders across flip events, not Mr. Oystacher's order entry behavior before any particular flip event.[31] In short, Professor Bessembinder's conclusion concerning acceleration with respect to Treasury Note Futures is based on the fallacy of aggregation.

19.     Panels A to H of Bessembinder Rebuttal, Table 2 Extended report the results Professor Bessembinder obtained when he "conducted the same analysis for the examined days and markets from [his] original report.[32] Professor Bessembinder claims that these panels "show very similar patterns in Mr. Oystacher's order entry in the

---

30. In my initial report, I explained why Professor Bessembinder's finding that the average entry-to-cancel time of Mr. Oystacher's cancel-side orders was shorter than the average entry-to-cancel time of non-flip orders and trade-side orders is consistent with the Not Spoofing Hypothesis. See Fischel Report, ¶ 48. In particular, I demonstrated that flips would be likely to occur shortly after the placement of aggressively-priced passive orders like the cancel-side orders because small changes in market conditions could result in a change in the desired direction of trade at the event price. Id. For the same reason, the finding that a substantial fraction of flip events fall into the Only1-5 category is consistent with the Not Spoofing Hypothesis.

31. Note that the totals reported in Appendix B match the totals reported on Bessembinder Rebuttal, Table 2, Panel I.

32. Bessembinder Rebuttal, ¶ 84.

thirty seconds prior to his flips, and support the same general conclusions."[33]  But

because Panels A to H of Bessembinder Rebuttal, Table 2 Extended use the same

methodology as Panel I, these panels reflect the same aggregation fallacy.  The table

below describes the distribution of flip events by order entry category for each product.

## Distribution of Mr. Oystacher's Flip Events By Order Entry Category Using 5-Second Buckets

| Product | Only 1-5 | Not Accelerated | Accelerated |
|---------|----------|-----------------|-------------|
| Crude Oil | 68.9% | 13.2% | 17.9% |
| Natural Gas | 54.5% | 27.7% | 17.8% |
| Copper | 49.8% | 17.8% | 32.5% |
| VIX | 23.3% | 67.1% | 9.5% |
| E-mini, June 2013 | 19.8% | 52.4% | 27.8% |
| E-mini, Dec 2013/Jan 2014 | 26.0% | 64.3% | 9.7% |
| E-mini, Sep 2014 | 28.1% | 47.4% | 24.6% |
| E-mini, Apr/May 2015 | 24.0% | 51.9% | 24.0% |
| Treasuries | 9.4% | 77.4% | 13.2% |

This table provides information concerning the enter-to-flip times of cancel-side orders entered before each flip event and after any previous flip event (the "event-related cancel-side orders), based on the number of orders in the 1-5 second, 5-10 second, 10-15 second,15-20 second, 20-25 second, and 25-30 second buckets.  A flip event is classified as "Only 1-5" if all of the event-related cancel-side orders are in the 1-5 second bucket.  A flip event is classified as "Not Accelerated" if the number of event-related cancel-side orders in the 1-5 second bucket is not greater than the number of event-related cancel-side orders in at least one of the other buckets.  A flip event is classified as "Accelerated" if the number of event-related cancel-side orders in the 1-5 second bucket is greater than the number of event-related cancel-side orders in any of the other buckets.

As the table shows, the data do not show a systematic pattern of "accelerated order entry"

in the five second interval before flips.[34]

### C.  The Characteristics of Mr. Oystacher's Flip Orders Are Consistent With the Not Spoofing Hypothesis

---

33.  Id.

34.  Professor Bessembinder's conclusion that that Mr. Oystacher "accelerated his rate of order entry on the cancel side … just prior to his flips" of the other relevant products also reflects the fallacy of aggregation, because his conclusion is based on the aggregate date presented in Bessembinder Report, Table 2.  See Bessembinder Report, ¶¶ 41-43; Bessembinder Rebuttal, ¶¶ 26 & 77.  We disaggregated the data and analyzed the enter-to-flip times of each cancel side order in one second intervals during the ten seconds prior to each flip event.  This analysis also shows that Mr. Oystacher typically did not accelerate his order entry just prior to flips.

20.     Professor Bessembinder makes a number of "observations" concerning the characteristics of Mr. Oystacher's orders for Treasury Note Futures on the examined dates in February 2016 that he claims "support the conclusion that Mr. Oystacher entered cancel-side orders with intent to spoof."[35]  I discuss each of these "observations" in this subsection.

**Multiple Orders**

21.     First, Professor Bessembinder observes that "Mr. Oystacher entered multiple orders on the cancel side of his flips (an average of 3.4 in the full set and 2.0 in the narrowed set, Table 3)."[36]  However, there are normal business reasons for entering multiple orders on one side of the market that Professor Bessembinder does not consider.  For example, a trader might want to have orders pending at different prices, which necessarily requires multiple orders.  I also understand that Mr. Oystacher's mouse is configured to allow for only a "big" click for "large" orders and a "small" click for "small" orders, which means that Mr. Oystacher had to enter multiple orders if he wanted to have open orders at any given price for either an intermediate number of contracts (i.e., a number between "small" and "large") or for more contracts than the number of contracts in a "large" order.  Therefore, while entering multiple orders may be consistent with the Spoofing Hypothesis, it also is consistent with the Not Spoofing Hypothesis.

22.     Moreover, the data also show that Mr. Oystacher frequently entered multiple non-flip orders and frequently had multiple open non-flip orders pending.  In particular, Mr. Oystacher entered an average of 1.95 non-flip buy orders per second in the seconds in which he entered non-flip buy orders, and an average of 1.93 non-flip sell orders in the seconds in which he entered non-flip sell orders.  Mr. Oystacher also had an average of 2.83 open non-flip

---

35. Bessembinder Rebuttal, ¶¶ 86 & 93-94.
36. Id., ¶ 87.

buy orders at the end of seconds in which he had open non-flip buy orders, and an average of 3.35 open non-flip sell orders at the end of seconds in which he had open non-flip sell orders. These findings establish that entering multiple orders on one side of the market is consistent with the Not Spoofing Hypothesis.

**Execution Rates and Price Aggressiveness**

        23.    Professor Bessembinder also observes that Mr. Oystacher's "execution rates … were low for his cancel-side orders (1.9% in the full set and 0.0% in the narrowed set) as compared to 17.3% for his non-flip orders," whereas "his execution rates for his trade-side orders were high (74.60% in the full set and 25.4% in the narrowed set)…."[37] As explained in my initial report, these differences in execution rates are consistent with the Not Spoofing Hypothesis for several reasons.[38] To begin with, trade-side orders, by definition, are orders entered at the same price or a more aggressive price than the price of the cancel-side orders, which means that at least a portion of each trade-side order should be executed, whereas cancel-side orders by definition are placed at less aggressive prices than marketable orders that do not ensure even partial execution.[39] Moreover, Mr. Oystacher's trade-side orders were open substantially longer, on average, which would likely result in higher execution rates.[40] Furthermore, as Professor Bessembinder concedes, "[i]t is to be expected that execution rates would be lower for Mr. Oystacher's cancel-side orders, since by definition these orders could not

---

37. Id.

38. Fischel Report, ¶ 30.

39. Bessembinder Rebuttal, Table 4, Panel I, row [3] (reporting average "Ticks to BBO at Entry" of 0.00 and -1.00 for cancel-side and trade-side orders in the narrowed set, respectively, and 0.01 and -0.88 for cancel-side and trade-side orders in the set of all flip events, respectively).

40. Id., Table 4, Panel I, row [7] (reporting average "Enter-to-Cancel Time (Seconds)" of 0.69 and 29.49 for cancel-side and trade-side orders in the narrowed set, respectively, and 23.36 and 132.72 for cancel-side and trade-side orders in the set of all flip events, respectively). As explained in my initial report, Professor Bessembinder's finding that Mr. Oystacher's trade-side orders had relatively long enter-to-cancel times indicates that Mr. Oystacher he believed he would be able to obtain additional fills if he left those orders open and, therefore, is not consistent with the claim that Mr. Oystacher thought he needed to enter "spoof orders" in order to get his trade-side orders filled.

have been executed fully."[41]

24.     In my initial report, I demonstrated that the pricing of Mr. Oystacher's trade-side orders was consistent with the Not Spoofing Hypothesis because those orders were marketable and Mr. Oystacher frequently entered marketable non-flip orders that were priced similarly.  That finding holds for Treasury Note Futures, too, as Mr. Oystacher placed 85 marketable non-flip orders on the examined dates, at an average price of -1.00 ticks to the BBO.[42]  I also demonstrated that the pricing of Mr. Oystacher's trade-side orders did not support Professor Bessembinder's claim "[e]ach flip represents a rather dramatic change in trading behavior" because Mr. Oystacher's cancel-side orders were generally entered at prices near the BBO.[43]  This finding also holds for the Treasury Note Futures contract.  On average, Mr. Oystacher's cancel-side orders were priced approximately at the BBO and his trade-side orders were entered at prices within one tick of the BBO.[44]  This means that Mr. Oystacher's flips represent a change in his reservation price of less than one tick (i.e., about 0.01 percent), on average.

**Order Size**

25.     Professor Bessembinder also observes that Mr. Oystacher's "cancel-side order entry was large relative to quantities already in the limit order book at the event price or better, averaging 1.73 times as large in the full set and 3.34 times as large in the narrowed set (Table 3)."[45]  However, the data show that the average sizes of Mr. Oystacher's non-flip orders

---

41. Bessembinder Report, ¶ 60.
42. Mr. Oystacher's marketable non-flip orders had an average execution rate of 76.3 percent, which is approximately the same as the average execution rate for his trade-side orders.
43. See Fischel Report, ¶ 18.
44. See Bessembinder Rebuttal, Table 4, row [3] (showing "Ticks to BBO at Entry" of 0.01 for cancel-side orders and -0.88 for trade-side orders).  For Treasury Note Futures on the examined dates, one tick was approximately 0.01 percent of the contract price.
45. Id., ¶ 87.

were larger than the average sizes of Mr. Oystacher's cancel-side orders.[46]  Therefore, the

average size of Mr. Oystacher's cancel-side orders is consistent with the Not Spoofing

Hypothesis.

**Personal Order Imbalance**

26.  Professor Bessembinder also observes that Mr. Oystacher's "personal set

of unexecuted orders (Table 4) was heavily imbalanced to the cancel side (66.0% imbalance in

the full set and 92.0% imbalance in the narrowed set) at the time he canceled his cancel-side

orders, as compared to times when he canceled his non-flip orders (40.3% imbalance) and when

he canceled his trade-side orders (23.4% in the full set and 4.0% in the narrowed set)."[47]  But, as

noted above, Mr. Oystacher frequently did not flip even when his personal set of unexecuted

orders was heavily imbalanced.[48]  Moreover, as discussed in my initial report, there are normal

business reasons for the placement of imbalanced orders.[49]  Therefore, the relatively large

imbalance in Mr. Oystacher's personal order book when his cancel-side orders were cancelled is

consistent with the Not Spoofing Hypothesis.

**Iceberg Usage**

27.  Professor Bessembinder also observes that Mr. Oystacher's "cancel-side

orders were rarely Icebergs (5.6% in the full set and 0.0% in the narrowed set) as compared to

his non-flip orders (25.3% Icebergs) and his trade-side orders (97.5% Icebergs in the full set and

100.0% in the narrowed set).[50]  These comparisons are somewhat misleading because Mr.

Oystacher's non-flip orders include both marketable orders (like his trade-side orders) and non-

---

46. Id., Table 4, Panel I, row [1] (reporting average "Order Size (Number of Contracts)" of 267.55 for
non-flip orders, as compared with averages of 111.00 and 119.23 for cancel-side orders in the
narrowed and full sets of flip events, respectively).
47. Id. ¶ 88.
48. See ¶¶ 12-13 supra.
49. Fischel Report, ¶ 34.
50. Bessembinder Rebuttal, ¶ 88.

marketable orders (like most of his cancel-side orders). Moreover, the relatively low rate of Iceberg usage for Mr. Oystacher's cancel-side orders is consistent with the Not Spoofing Hypothesis because any trader who wants his entire order to have time priority will not use the Iceberg option.[51] Furthermore, because a fully displayed order has time priority, such orders are more likely to be executed than Iceberg orders. In that respect, Mr. Oystacher's low rate of Iceberg usage on cancel-side orders is not consistent with the Spoofing Hypothesis (because a trader engaged in a spoofing strategy does not want his "spoof orders" to be executed).

**Changes in Market Conditions After Order Entry**

28. In his initial report, Professor Bessembinder purported "[t]o assess whether Mr. Oystacher's cancel-side orders led, on average, to outcomes consistent with successful spoofing" by measuring "the change, from the millisecond before Mr. Oystacher's first cancel-side order is entered until the millisecond before his flip, in the BBO (best bid or offer), as well as in the count of orders and quantity of contracts on the public limit order book at the cancel-side order prices, or better … adjusted … for the effect of Mr. Oystacher's cancel-side orders."[52] With respect to Mr. Oystacher's flip events involving Treasury Note Futures on the examined dates, Professor Bessembinder finds that "these improvements were generally not statistically significant in the relatively small samples."[53] In other words, Professor Bessembinder's analysis does not establish that Mr. Oystacher's cancel-side orders caused changes in market conditions that would be "consistent with successful spoofing."

29. Moreover, Professor Bessembinder did not consider whether there were other changes in market conditions during the period between the entry and cancellation times of Mr. Oystacher's cancel-side orders that would be consistent with the Not Spoofing Hypothesis.

---

51. See Fischel Report, ¶ 26.
52. Bessembinder Report, ¶ 69.
53. Bessembinder Rebuttal, ¶ 89.

In fact, however, the data below show that at least one of these changes occurred in 49 of the 53 flip events (i.e., 92.5 percent) in the set of all flips, and both of the flip events in the narrowed set.[54]

## Frequency of Changes in Market Conditions Consistent with the Not-Spoofing Hypothesis

| Market Condition | | All Flip Events (N=53) | Narrowed Set of Flip Events (N=2) |
|---|---|---|---|
| Deterioration in the Cancel-Side BBO | [1] | 1.9% | 0.0% |
| Decrease in Quantity of Cancel-Side Contracts at the BBO | [2] | 37.7% | 0.0% |
| Execution of an Order at the Cancel-Side BBO | [3] | 60.4% | 100.0% |
| Improvement in the Trade-Side BBO | [4] | 1.9% | 0.0% |
| Increase in Quantity of Trade-Side Contracts at the BBO | [5] | 45.3% | 0.0% |
| Execution of an Order at the Trade-Side BBO | [6] | 79.2% | 50.0% |
| At Least One of [1] - [6] | [7] | 92.5% | 100.0% |

**Cancel-Side Orders that Meet Professor Bessembinder's Narrowing Criteria**

30.     Professor Bessembinder also observes that only two of Mr. Oystacher's 53 flip events meet the "narrowing criteria" that he claims provide the "[strongest] indications of spoofing intent" and that three additional flip events met all of the narrowing criteria other than the criterion that order entry on the cancel side at least

---

54. As noted in my initial report, these are just a subset of the changes in market conditions that may have provided Mr. Oystacher with a normal business reason for flipping. For example, Mr. Oystacher might have placed his trade-side orders because of price movements he observed in correlated markets after his cancel-side orders were placed or because the failure of his cancel-side orders to execute was informative in light of the relevant facts and circumstances at the time these orders were placed.

doubled the existing quantity of orders displayed at the entry price or better (the "size criterion").[55] Thus, even if Professor Bessembinder's narrowing criteria were accepted as an indication of spoofing intent, the characteristics of Mr. Oystacher's flip orders in Treasury Note Futures on the examined dates do not strongly support the Spoofing Hypothesis. Moreover, for the reasons discussed above, cancel-side orders that meet the narrowing criteria also can be consistent with the Not Spoofing Hypothesis. Furthermore, the data show that 2,068 of the other traders' 7,709 flip events (i.e., 26.8 percent) include cancel-side orders that satisfy all of Professor Bessembinder's narrowing criteria other than the size criterion. As explained above, the average size of Mr. Oystacher's cancel-side orders is much larger than the average size of the cancel-side orders placed by other traders.[56] Therefore, a larger fraction of Mr. Oystacher's cancel-side orders meet the size criterion.[57] Nevertheless, the data show that 135 of the other traders 7,709 flip events (i.e., 1.8 percent) include cancel-side orders that satisfy all of Professor Bessembinder's narrowing criterion (including the size criterion). These findings demonstrate that orders that satisfy Professor Bessembinder's narrowing criteria are consistent with the Not Spoofing Hypothesis.

---

55. Bessembinder Rebuttal, ¶ 91; Bessembinder Report, ¶ 51. "As in [his] original report," Professor Bessembinder's "narrowing criteria excluded orders entered more than one second prior to its cancelation, any event where a cancel-side order created a new BBO, any event where the combined quantity of contracts entered on the cancel side did not at least equal the quantity of contracts already displayed on the limit order book at the event price or better, and any Iceberg orders." Bessembinder Rebuttal, note 14.

56. See ¶ 10 supra.

57. As explained previously, the data show that the average sizes of Mr. Oystacher's non-flip orders were larger than the average sizes of Mr. Oystacher's cancel-side orders. See ¶ 25 supra. Therefore, the sizes of Mr. Oystacher's cancel-side orders are consistent with the Not Spoofing Hypothesis. Id.

- 22 -

Daniel R. Fischel

March 21, 2016

## Appendix A:  Additional Materials Considered

- CFTC's 10/18/15 Complaint and all attachments thereto;

- CFTC's 11/9/15 Memorandum in Support of Motion for Preliminary Injunction and all exhibits thereto;

- CFTC 11/24/2015 production -- CFTC_ORDER_DATA 1 (order data);

- CFTC 12/23/2015 -- CFTC_ORDER_DATA 2-5 (data dictionaries);

- CFTC 1/7/2016 production -- CFTC1-12 (computer code) ;

- CFTC's 2/11/2016 production -- CFTC 0234038-234095 (ZN data and updated version of Bessembinder code);

- CFTC's 3/11/2016 production – CFTC 0234096-0234110 (ZN data and Bessembinder code);

- Deposition Transcript of Stephen J. Strohmer, March 4, 2016;

- Deposition Transcript of Igor B. Oystacher, Vol.1, March 10, 2016;

- Deposition Transcript of Igor B. Oystacher, Vol. 2, March 11, 2016;

- Deposition Transcript of Greg O'Connor, March 7, 2016;

- Trial transcript from United States v. Coscia, 2014-cr-00551 (N.D. Ill.);

- 3Red's Wells submissions -- 5/27/14, 9/12/14, 9/24/14, 12/3/2014, 7/10/2015, 8/13/2015;

- CFE 1/15/2016 production: CFE 1 - CFE 54;

- Advantage 1/15/2016 production: Advantage 1 - Advantage 4077;

- CFE 1/20/2016 production: CFE 55 - CFE 260;

- Citadel 1/22/2016 production: Citadel 1 - Citadel 123;

- CFE 1/25/2016 production: CFE 261-14306;

- Advantage 1/27/2016 production: Advantage 4078 - Advantage 5201;

- CFE 1/28/2016 production: CFE 14307 - CFE 23773;

- CFE 2/2/2016 production : CFE 23774 - CFE 24098;

- Citadel 2/2/16 production: Citadel 124 - Citadel 893;

- Plaintiff's 2/16/16 Response to Defendants First Set of Interrogatories ;

- CME Group RA 1405-5, August 29, 2014;

- Publicly available materials listed on Bessembinder Report, Appendix B;

- Hendrik Bessembinder, Rebuttal to the reports of Daniel R. Fischel and Jerry W. Markham, March 11, 2016;

- "The Flash Crash: A New Deconstruction," by E. Aldrich, J. Grundfest, and G. Laughlin, January 25, 2016 draft, pp. 1 - 43.

**Appendix B: Mr. Oystacher's Order Entry by Seconds to Next Flip**
**Treasury Note Futures**

**Only 1 to 5**

| Flip # | 1 to 5 | 6 to 10 | 11 to 15 | 16 to 20 | 21 to 25 | 26 to 30 |
|--------|--------|---------|----------|----------|----------|----------|
| 8 | 3 | 0 | 0 | 0 | 0 | 0 |
| 40 | 7 | 0 | 0 | 0 | 0 | 0 |
| 46 | 3 | 0 | 0 | 0 | 0 | 0 |
| 48 | 2 | 0 | 0 | 0 | 0 | 0 |
| 50 | 3 | 0 | 0 | 0 | 0 | 0 |

**Not Accelerated**

| Flip # | 1 to 5 | 6 to 10 | 11 to 15 | 16 to 20 | 21 to 25 | 26 to 30 |
|--------|--------|---------|----------|----------|----------|----------|
| 1 | 1 | 3 | 0 | 0 | 0 | 2 |
| 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 0 | 3 | 0 | 2 | 3 | 3 |
| 5 | 1 | 3 | 1 | 0 | 0 | 0 |
| 6 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 0 | 0 | 1 | 0 | 1 | 0 |
| 11 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12 | 2 | 2 | 0 | 0 | 0 | 0 |
| 13 | 1 | 4 | 6 | 6 | 4 | 0 |
| 14 | 1 | 0 | 3 | 3 | 0 | 1 |
| 15 | 0 | 0 | 0 | 4 | 0 | 0 |
| 16 | 3 | 0 | 0 | 3 | 2 | 3 |
| 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | 0 | 0 | 3 | 2 | 4 | 0 |
| 19 | 3 | 0 | 0 | 0 | 3 | 8 |
| 20 | 0 | 0 | 1 | 3 | 5 | 0 |
| 21 | 10 | 2 | 0 | 1 | 11 | 0 |
| 22 | 0 | 4 | 2 | 1 | 0 | 0 |
| 23 | 1 | 0 | 3 | 0 | 0 | 0 |
| 24 | 0 | 0 | 0 | 3 | 0 | 2 |
| 25 | 0 | 0 | 0 | 0 | 0 | 0 |
| 26 | 0 | 0 | 0 | 0 | 0 | 0 |
| 27 | 0 | 0 | 0 | 0 | 0 | 0 |
| 28 | 0 | 3 | 0 | 0 | 0 | 0 |
| 29 | 0 | 1 | 0 | 0 | 0 | 1 |
| 30 | 0 | 0 | 0 | 0 | 0 | 0 |
| 31 | 1 | 3 | 0 | 0 | 0 | 0 |
| 32 | 0 | 0 | 0 | 0 | 0 | 0 |
| 33 | 0 | 0 | 0 | 0 | 0 | 0 |
| 34 | 2 | 1 | 0 | 3 | 0 | 0 |

| 36 | 1 | 6 | 0 | 0 | 0 | 0 |
|----|---|---|---|---|---|---|
| 37 | 0 | 0 | 7 | 0 | 0 | 0 |
| 38 | 0 | 0 | 0 | 0 | 0 | 0 |
| 39 | 3 | 4 | 10 | 0 | 0 | 3 |
| 42 | 4 | 0 | 0 | 0 | 4 | 0 |
| 43 | 0 | 0 | 0 | 0 | 0 | 1 |
| 44 | 2 | 4 | 3 | 0 | 0 | 0 |
| 45 | 3 | 0 | 5 | 0 | 0 | 0 |
| 47 | 1 | 1 | 0 | 0 | 0 | 0 |
| 51 | 2 | 4 | 0 | 0 | 0 | 0 |
| 52 | 0 | 0 | 0 | 0 | 0 | 0 |

**Accelerated**

| Flip # | 1 to 5 | 6 to 10 | 11 to 15 | 16 to 20 | 21 to 25 | 26 to 30 |
|--------|--------|---------|----------|----------|----------|----------|
| 2 | 4 | 3 | 0 | 0 | 0 | 0 |
| 9 | 5 | 0 | 1 | 0 | 0 | 0 |
| 10 | 5 | 2 | 0 | 0 | 0 | 0 |
| 35 | 8 | 0 | 0 | 0 | 1 | 1 |
| 41 | 7 | 3 | 0 | 0 | 0 | 0 |
| 49 | 11 | 2 | 0 | 0 | 0 | 0 |
| 53 | 5 | 2 | 0 | 0 | 0 | 0 |

**Totals Across All Categories**

|       | 1 to 5 | 6 to 10 | 11 to 15 | 16 to 20 | 21 to 25 | 26 to 30 | 31+ |
|-------|--------|---------|----------|----------|----------|----------|-----|
| Total | 105 | 60 | 46 | 31 | 38 | 25 | 820 |

**Notes:**

This appendix provides information concerning the enter-to-flip times of Mr. Oystacher's cancel-side orders for Treasury Note Futures entered before each flip event and after any previous flip event (the "event-related cancel-side orders), based on the number of orders in the 1-5 second, 5-10 second, 10-15 second,15-20 second, 20-25 second, and 25-30 second buckets. A flip event is classified as "Only 1-5" if all of the event-related cancel-side orders are in the 1-5 second bucket. A flip event is classified as "Not Accelerated" if the number of event-related cancel-side orders in the 1-5 second bucket is <u>not</u> greater than the number of event-related cancel-side orders in at least one of the other buckets. A flip event is classified as "Accelerated" if the number of event-related cancel-side orders in the 1-5 second bucket is greater than the number of event-related cancel-side orders in any of the other buckets. The "Flip #" shown is the identification number assigned to a particular flip event in the backup materials for the Bessembinder Rebuttal.