**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES | ) | |
| TRADING COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-CV-9196 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| IGOR B. OYSTACHER and | ) | |
| 3 RED TRADING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Igor Oystacher and 3Red Trading, LLC (collectively, "Defendants") move for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the foregoing reasons, the Court denies Defendants' motion.

## BACKGROUND[1]

The CFTC asserts that from December 2011 through at least February 2016, Defendants "intentionally and repeatedly engaged in a manipulative and deceptive spoofing scheme while placing orders for and trading futures contracts on multiple registered entities." (R. 1, Complaint, at ¶ 2.) Specifically, the CFTC alleges that Defendants' "scheme created the appearance of false market depth that Defendants exploited to benefit their own interests, while harming other . . . participants" across a number of markets in violation of Sections 4c(a)(5)(C) and 6(c)(1) of the Commodities Exchange Act (the "CEA"), 7 U.S.C. §§ 6c(a)(5)(C) & 9(1) (2012) (the "Spoofing Statute"), and CFTC Regulation 180.1, 17 C.F.R. §180.1 (2014). (*Id.* at ¶¶ 2, 6.)

---

[1] The Court refers to its July 12, 2016 Opinion for further details regarding the facts underlying the case. (R. 195.)

In 2010, Section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010) amended Section 4c(a)(5)(C) of the CEA, entitled "Disruptive Practices," to add the Spoofing Statute. The Spoofing Statute provides, in relevant part, as follows:

> (5) It shall be unlawful for any person to engage in any trading, practice, or conduct on or subject to the rules of a registered entity that –
>
> (C) Is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before the execution).

7 U.S.C. § 6c(a)(5)(C).

Additionally, on July 14, 2011, the CFTC adopted CFTC Regulation 180.1(a)(1) pursuant to the CFTC's expanded anti-fraud and anti-manipulation authority under Section 753 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010). CFTC Regulation 180.1(a)(1) provides, in relevant part, as follows:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud[.]

17 C.F.R. § 180.1(a)(1); *see also CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1007 (N.D. Ill. 2015) ("In publishing Regulation 180.1, the CFTC explained that 'Final Rule 180.1 prohibits fraud and fraud-based manipulations.'") (citing *Final Rule*, 76 Fed. Reg. at 41,400; 17 C.F.R. § 180.1).

On November 9, 2016, the CFTC moved for a preliminary injunction, prohibiting Defendants from trading in the Copper, Crude Oil, Natural Gas, S&P 500 E-mini ("ES"), Volatility Index ("VIX"), and Ten Year T-note Treasury Futures ("ZN") markets. (R. 20, 72.)

The Court, thereafter, held a lengthy preliminary injunction hearing. On July 12, 2016, the Court denied the CFTC's motion for preliminary injunction, but added various restrictions and obligations on Defendants. (R. 195.)

Defendants now move for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Defendants essentially assert three arguments: 1) the Spoofing Statute is unconstitutionally vague, 2) CFTC Regulation 180.1 is unconstitutionally vague, and 3) the Spoofing Statute constitutes an unconstitutional delegation by Congress. The Court disagrees with all three.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial. *See* Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) 'is designed to provide a means of disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court may take judicial notice.'" *Archer Daniels Midland Co. v. Burlington Ins. Grp.*, No. 10-CV-1533, 2011 WL 1196894, at *2 (N.D. Ill. Mar. 29, 2011) (quoting *Cincinnati Ins. Co. v. Contemporary Distrib., Inc.*, No. 09-CV-2250, 2010 WL 338943, at *2 (N.D. Ill. Jan. 26, 2010)).

"A motion for judgment on the pleadings under rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014)). As such, "the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim

for relief." *Id.* (citing *Fortres Grand Corp. v. Warner Bros. Entm't. Inc.*, 763 F.3d 696, 700 (7th Cir. 2014) (applying Rule 12(b)(6)). "A plaintiff's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Yeadon Fabric Domes, LLC v. Roberts Environmental Control Corp.*, No. 15 CV 6679, 2016 WL 3940098, *1 (N.D. Ill. July 21, 2016) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Put differently, "a 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citation and quotation marks omitted). "All reasonable inferences are drawn in favor of the non-movant." *Id.* (citing *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015)). Ultimately, a court will grant a motion for judgment on the pleadings only if "no genuine issues of material fact remain to be resolved and . . . the [moving party] is entitled to judgment as a matter of law." *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 2012); *see also Hartford Fire Ins. Co. v. Thermos LLC*, 146 F. Supp. 3d 1005, 1012 (N.D. Ill. 2015) (citing *Alexander*, 994 F.2d at 336).

## ANALYSIS

Defendants move for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Defendants claims that 1) the Spoofing Statute is unconstitutionally vague, 2) CFTC Regulation 180.1 is unconstitutionally vague, and 3) the Spoofing Statute constitutes an unconstitutional delegation by Congress. The Court addresses each in turn.

## I.      The Spoofing Statute is Not Unconstitutionally Vague

Defendants first claim that "the Spoofing Statute is unconstitutionally vague, and the CFTC's claims fail as a matter of law." (R. 164-1 at 22.) Specifically, Defendants argue that the "'is spoofing' prong of the Spoofing Statute is vague, because it fails [to] give notice of what

type of trading conduct constitutes 'spoofing' as opposed to legitimate trading." (*Id.*) "And if it is unclear what facts must be proved to make out a claim," Defendants assert, "then there is certainly no basis to conclude that Mr. Oystacher received adequate notice of what conduct was forbidden under the Spoofing Statute." (*Id.*)  The Court disagrees.  The Spoofing Statute's "is spoofing" prong, as applied to Defendant Oystacher, is not unconstitutionally vague.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *United States v. Brown*, No. 14 CR 674, 2015 WL 6152224, at *3 (N.D. Ill. Oct. 19, 2015) (citing *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317, 183 L. Ed. 2d 234 (2012)).  "A statute is unconstitutionally vague if it 'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.'" *United States v. Morris*, 821 F.3d 877, 879 (7th Cir. 2016) (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556, 192 L. Ed. 2d 569 (2015)).  In other words, "[a] challenge to a statute's vagueness 'rest[s] on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.'" *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988)).  Under the Constitution, Congress is not permitted to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and should be set at large." *City of Chicago v. Morales*, 527 U.S. 41, 60, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (citing *United States v. Reese*, 92 U.S. 214, 221, 23 L. Ed. 563 (1875)).  "[F]ew words," however, "possess the precision of mathematical symbols[.]" *Boyce Motor Lines v. United States*, 342 U.S. 337, 340, 72 S. Ct. 329, 96 L. Ed. 367 (1952) (citing *Nash v. United States*, 229 U.S. 373, 377, 33 S. Ct. 780, 781, 57 L. Ed. 1232 (1913)); *see also Lim*, 444 F.3d at 915 (citing

*Boyce Motor Lines*, 342 U.S. at 340)).  Rather, "most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions.  Consequently, no more than a reasonable degree of certainty can be demanded." *Id*. (citations omitted).  Indeed, "the fact that Congress could have employed '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted' was unconstitutionally vague." *Lim*, 444 F.3d at 916 (quoting *United States v. Powell*, 423 U.S. 87, 93, 96 S. Ct. 316, 320, 46 L. Ed. 2d 228 (1975)).  Ultimately, courts must, if possible, "construe, not condemn, Congress' enactments." *Skilling v. United States*, 561 U.S. 358, 403, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) (citing *Civil Serv. Comm'n v. Letter Carriers*, 413 U.S. 548, 571, 93 S. Ct. 2880, 37 L. Ed. 2d 796 (1973); *United States v. Nat'l. Dairy Prods., Corp.*, 327 U.S. 29, 32, 83 S. Ct. 594, 9 L. Ed. 2d 561 (1963)).

"The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Independents Gas & Serv. Stations Ass'ns., Inc. v. City of Chicago*, 112 F. Supp. 3d 749, 754 (N.D. Ill. 2015) (quoting *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999)).  Importantly, "[v]agueness challenges to statutes that do not involve First Amendment interests are examined in light of the facts of the case at hand." *Id*. (citing *Maynard*, 486 U.S. at 361); *see also United States v. Calimlim*, 538 F.3d 706, 710 (7th Cir. 2008) ("A vagueness challenge not premised on the First Amendment is evaluated as-applied, rather than facially.") (citing *Chapman v. United States*, 500 U.S. 453, 467, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991)).  This case does not involve a First Amendment issue.  Instead, Defendants' vagueness challenge targets economic legislation.  Economic regulations are subject to a "less stringent" void for vagueness standard.  *See Brockert v. Skornica*, 711 F.2d 1376, 1391 (7th Cir. 1983); *see, e.g.,*

*Cruz v. Town of Cicero*, No. 99 C 3286, 2000 WL 369666, at *3 (N.D. Ill. Apr. 6, 2000).  As the

Seventh Circuit explains, "[e]conomic regulation usually deals with a narrower subject and those

affected by it are more likely to consult the law, seeking clarification if necessary, in order to

plan their behavior." *Brockert*, 711 F.2d at 1381 (citing *Vill. of Hoffman Estates v. Flipside,*

*Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)).  As the

*Hoffman Estates* Court clarified:

> [E]conomic regulation is subject to a less strict vagueness test because its subject
> matter is often more narrow, and because businesses, which face economic
> demands to plan behavior carefully, can be expected to consult relevant
> legislation in advance of action.  Indeed, the regulated enterprise may have the
> ability to clarify the meaning of the regulation by its own inquiry, or by resort to
> an administrative process.

*Hoffman Estates*, 455 U.S. at 498 (footnotes and citations omitted); *see also Record Head v.*

*Sachen*, 682 F.2d 672, 676 (7th Cir. 1982) (economic regulation is "directed at people who are

assumed to have some expertise and some ability to demand clarification").  Also, vague terms

of an economic regulation "may be given content through proper application." *Brockert*, 711

f.2d at 1381 (citation omitted).

The CFTC has charged Defendants with violating the Spoofing Statute, Sections

4c(a)(5)(C) and 6(c)(1) of the CEA, 7 U.S.C. §§ 6c(a)(5)(C) & 9(1) (2012).  As noted earlier, the

Spoofing Statute provides, in relevant part, as follows:

> (5) It shall be unlawful for any person to engage in any trading, practice, or
> conduct on or subject to the rules of a registered entity that –
>
> (C) Is, is of the character of, or is commonly known to the trade as, "spoofing"
> (bidding or offering with the intent to cancel the bid or offer before the
> execution).

7 U.S.C. § 6c(a)(5)(C).  As Defendants' vagueness challenges do not involve Defendant

Oystacher's First Amendment interests, the Court must assess them in light of the facts at hand.

The Court now turns to the Complaint's factual allegations which the Court must accept as true. *See Yeadon Fabric Domes*, 2016 WL 3940098, at *1 (citing *Iqbal*, 556 U.S. at 678).

The Complaint explicitly alleges that Defendant Oystacher placed both bids and offers with the intent to cancel those bids or offers before execution. (R. 1 at ¶ 87 ("Defendants' pattern of placing visible passive (spoof) order(s) for a large number of contracts, at or near the best bid or offer price, then simultaneously canceling them and flipping to aggressively take the other side of the market at the same or better price demonstrates their intent, at the time they placed them, to cancel these spoof orders prior to execution.").) Moreover, the CFTC illustrates this unlawful intent by detailing Defendant Oystacher's manipulative trading patterns. (*Id*. at ¶ 54 (alleging that Defendant Oystacher "engaged in a . . . pattern of spoofing conduct across all relevant markets during the relevant period.").) As explained at length in the Court's July 12, 2016 Opinion, the CFTC delineates Defendant Oystacher's deceptive misconduct as follows:

1) placing at least one, and in many instances multiple "spoof orders" on one side of the market with the intent to cancel these orders before execution;

2) placing these orders at or near the best bid or offer price as passive orders, behind existing orders;

3) placing these orders for large numbers of contracts, at least doubling the number of contracts offered or bid at those price levels or better, to create the false impression of market depth and book pressure on that side of the market, in order to induce other market participants (including both manual traders and those using computer algorithms to make trading decisions) to place orders on the same side of the market;

4) canceling all of the spoof order(s) simultaneously within one second of entry, largely before they could execute;

5) using the "avoid orders that cross" functionality to place "flip" order(s) as aggressive order(s) which would simultaneously (within 5 milliseconds) cancel any opposite order(s) at the same or better price. The aggressive flip order(s), except in one instance, then traded against market participants that had joined the "spoof orders" before those market participants could assess and react to the updated market information; and

6) often placing the aggressive flip orders as partially visible "iceberg" orders to maximize the likelihood they would be filled.

(*Id*.)  These systematic trading actions, the CFTC alleges, "created a strong (but false) signal regarding interest on one side of the market.  These large spoof orders deceptively encouraged other market participants (and their algos programmed to react to changes in book pressure) to enter orders on the same side of the market as the spoof orders."  (*Id*. at ¶ 59.)  Defendant Oystacher would subsequently "trade against" market participants that were drawn to the artificial market depth.  (*Id*. at ¶ 54.)  In addition, the CFTC includes market data highlighting parts of Defendant Oystacher's trading pattern in support of its allegation that he entered bids or offers with the intent to cancel those bids or offers before execution.  Specifically, the data illustrates, in part, Defendant Oystacher's "manipulative and deceptive 'flips,'" cancellation speeds, iceberg order usage, and fill and cancellation rates, and market reactions to Defendant's trading as measured by the average increase of contracts participants entered.  (*Id*. at ¶ 55; *Id*. at ¶ 58; *Id*. at 65; *Id*. at 70; *Id*. at 89.)  Finally, the CFTC highlights examples of Defendant Oystacher's orders that it claims constitute spoofing.  (*Id*. at ¶ 71, ¶ 79.)  Ultimately, the CFTC concludes, Defendant Oystacher's repeated trading pattern, the market depth deception, and resulting profit-motive, considered in the aggregate, all evidence his intent to cancel orders before execution, in violation of the Spoofing Statute.

Considering the CFTC's allegations as true, Defendant Oystacher's trading behavior falls within the Spoofing Statute's defined prohibition.  The Spoofing Statute forbids and parenthetically defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution."  7 U.S.C. § 6c(a)(5)(C).  The CFTC, through Defendant Oystacher's aggregate trading patterns, alleges a plausible claim that he did exactly that.  Thus, Defendant

Oystacher's trading behavior "track[ed] the language of the statute, and constitutes 'spoofing' as the statute defines that term." *United States v. Coscia*, 100 F. Supp. 3d 653, 658 (N.D. Ill. 2015) (quoting 7 U.S.C. § 6c(a)(5)(C)). Moreover, the Spoofing Statute's scienter requirement mitigates any vagueness concerns. The United States Supreme Court has made it clear that "a scienter requirement in a statute 'alleviate[s] vagueness concerns,' 'narrow[s] the scope of [its] prohibition[,] and limit[s] prosecutorial discretion.'" *McFadden v. United States*, 135 S. Ct. 2298, 2307, 192 L. Ed. 2d 260 (2015) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149, 150, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."); *see also Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 526, 114 S. Ct. 1747, 128 L. Ed. 2d 539 (1994) ("'[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice . . . that [the] conduct is proscribed.'") (quoting *Hoffman Estates*, 455 U.S. at 499). As the court in *Coscia* explained:

> The statute's "intent to cancel" requirement is significant. "When the government must prove intent and knowledge, these requirements do much to destroy any force in the argument that application of the statute would be so unfair that it must be held invalid." *United States v. Cherry*, 938 F.2d 748, 754 (7th Cir. 1991) (citations, internal quotations, and alterations omitted). . . . Because the alleged conduct clearly involves "bidding or offering with the intent to cancel" the Court does not find § 6c(a)(5)(C) impermissibly vague as applied[.]

*Coscia*, 100 F. Supp. 3d at 659. Here, the CFTC's allegations make it clear that Defendant Oystacher's trading patterns relied on bidding or offering with the unlawful intent to cancel those bids or offers before execution. In light of the Spoofing Statute's parenthetical definition and scienter requirement, the statute provided reasonable notice to Defendant Oystacher that this trading conduct was prohibited. *See Boyce Motor Lines*, 342 U.S. at 340 ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall

take risk that he may cross the line.") (citing *Nash*, 229 U.S. at 377); *see also Morris*, 821 F.3d at 879 (citing *Johnson*, 135 S. Ct. at 2556); *Lim*, 444 F.3d at 915 (citing *Maynard*, 486 U.S. at 361). Thus, the Spoofing Statute, as applied to Defendant Oystacher, is not unconstitutionally vague.

Defendants' arguments to the contrary are unavailing. Defendants first argue that the "CFTC's claims do not fit squarely within the [Spoofing Statute] parenthetical[.]" (R. 164-1 at 22.) Specifically, Defendants contend that "[t]he CFTC has not, and cannot, allege any direct evidence of any 'intent to cancel.' And merely alleging that Mr. Oystacher had the intent to cancel before execution, without supporting facts is insufficient to push the CFTC's claims into the realm of plausibility." (R. 164-1 at 22–23 (citations omitted).) "As they stand," Defendants conclude, "the allegations about Mr. Oystacher's intent are conclusory." (*Id*. at 23.) This assertion is patently false. The Complaint, as detailed above, presents a plethora of circumstantial evidence alleging Defendant Oystacher's unlawful "intent to cancel." "Circumstantial evidence of intent is just as probative as direct evidence." *United States v. Cunningham*, 54 F.3d 295, 299 (7th Cir. 1995) (citing *United States v. DeCorte*, 851 F.2d 948, 954 (7th Cir. 1988)). *CFTC v. Kraft Foods Grp., Inc.* is instructive. There, the court held that

> [i]ntent is what separates "lawful business conduct from unlawful manipulative activity." *Indiana Farm Bureau Cooperative Ass'n, Inc*., No. 75-14, 1982 WL 30249, at *6 (CFTC Dec. 17, 1982). This means that the intent to artificially affect prices can convert otherwise legal, open-market transactions into manipulative activity. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008). As the court in *In re Amaranth* explained: "Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate. Thus, a legitimate transaction combined with an improper motive is commodities manipulation." *Id*. *Because proof of intent is often based on circumstantial evidence*, "*manipulative intent must normally be shown inferentially from the conduct of the accused*." *CFTC v. Enron Corp.*, No. 03 909, 2004 WL 594752, at *7 (S.D. Tex. Mar. 10, 2004) (citing *Indiana Farm Bureau*, 1982 WL 30249, at *7).

*Kraft Foods Grp., Inc.*, 153 F. Supp. 3d at 1020–21 (N.D. Ill. 2015) (emphasis added); *see also Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) ("[I]ntent to defraud means that the defendant acted willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another. *Because direct evidence of intent is often unavailable, intent to defraud 'may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension.'")* (quoting *United States v. Pust*, 798 F.3d 597, 600 (7th Cir. 2015)) (emphasis added). It bears repeating that, at this stage, the Complaint must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Yeadon Fabric Domes*, 2016 WL 3940098, *1 (quoting *Iqbal*, 556 U.S. at 678) (citation and quotation marks omitted); *see also Lodholtz*, 778 F.3d at 639. It does not have to allege all of the CFTC's evidence regarding intent. Here, the Complaint presents a detailed description of Defendant Oystacher's trading patterns, relevant market data, and examples of his trading it alleges constitute spoofing. Considering these alleged facts in the aggregate and drawing all reasonable inferences in favor of the CFTC, the Complaint properly alleges that Defendant Oystacher traded with an unlawful "intent to cancel."

Defendants next argue that "[t]here is . . . a dearth of plausible allegations to suggest that Mr. Oystacher's alleged cancelations were the result of a preconceived intent to cancel as opposed to a lawful reason." (R. 164-1 at 23.) Specifically, Defendants contend that "there is not a single allegation concerning how Mr. Oystacher would profit from this purported scheme." (*Id.*) This is also markedly incorrect. As detailed earlier, the Complaint alleges, in part, that Defendant Oystacher "us[ed] the 'avoid orders that cross' functionality to place 'flip' order(s) as

aggressive order(s) which would simultaneously (within 5 milliseconds) cancel any opposite order(s) at the same or better price. The aggressive flip order(s), except in one instance, then *traded against market participants* that had joined the 'spoof orders' before those market participants could assess and react to the updated market information." (R. 1 at ¶ 54 (emphasis added).) Defendant Oystacher's trading scheme, the CFTC adds, "created the appearance of false market depth that Defendants exploited to benefit their own interests, while harming other market participants." (*Id*. at ¶ 2.) Indeed, the Complaint *explicitly* spells out how Defendant Oystacher would profit from this trading conduct on numerous occasions. (*Id*. at ¶ 3 ("This strategy allowed Defendants to buy or sell futures contracts in quantities and/or at price levels that would not have otherwise been available to them in the market, absent the spoofing conduct.").); (*Id*. at ¶ 67 ("Oystacher and 3 Red placed and canceled the spoof orders in this manner to maximize their opportunities to trade in quantities and/or at price levels that would not have otherwise been available absent the appearance of false market depth and book pressure, and the resulting joinder by other market participants.").); (*Id*. at ¶ 91 ("Defendants' spoofing strategy was deceptive in that their placement and cancellation of large orders was not intended to result in the execution of these orders, but rather to create the false impression of sudden book pressure on one side of the market, so as to fraudulently induce other market participants to place orders at prices they otherwise would not have placed under regular market conditions, absent Defendants' spoofing.").)

Defendants' argument that there is not "a single allegation about the market conditions . . . at the times Mr. Oystacher cancelled his orders and flipped" meets the same fate. (R. 164-1 at 23.) Indeed, the Complaint alleges that "Defendants did not merely change their mind as to the direction of the market so quickly, so often, and with such precision, but rather intended to

cancel these orders at the time they were placed." (*Id.* at ¶ 88.) In other words, Defendant

Oystacher's predictable speed, volume, and precision exhibited in his alleged unlawful trading

patterns illustrate that he was not reacting to unexpected market conditions.

Finally, Defendants claim that "the CFTC has concluded . . . based solely on *fast

cancellations of large orders*, that 3 Red placed orders with the intent to cancel them prior to

execution." (R. 192 at 8 (emphasis in original).) The Complaint, however, is riddled with

allegations to the contrary. As explained earlier, the CFTC, through factual allegations, data, and

examples, repeatedly portrays, in part, Defendant Oystacher's alleged pattern of passive spoof

order placement at or near the best bid or offer price shielded by existing orders, flips, aggressive

order placement, "avoid orders that cross" tool usage, iceberg order usage, large order size, and

cancellation speed. *See, generally,* (R. 1.) Considering this trading behavior in the aggregate, it

is clear that the CFTC relies on much more than "solely . . . fast cancellations of large orders."

(R. 192 at 9 (alteration to original).) Likewise, Defendants' notion that none of this trading

behavior is "prohibited by the Spoofing Statute" is ineffective. (*Id.*) "Few words, possess the

precision of mathematical symbols[.]" *Boyce Motor Lines*, 342 U.S. at 340. Indeed, "[g]reater

leeway in definition is allowed the legislature in the context of regulatory statutes governing

business activities." *Miner v. Gov't. Payment Serv., Inc.*, No. 14-cv-7474, 2015 WL 3528243, at

*9 (N.D. Ill. June 4, 2015) (stressing the "'futility of attempting to anticipate and enumerate all

the (unfair) methods' and practices that fertile minds might devise.") (quoting *Fitzgerald v.

Chicago Title & Trust Co.*, 380 N.E.2d 790 (Ill. 1978)); *see also Mannix v. Phillips*, 619 F.3d

187, 197 (2d Cir. 2010) (Stating that laws "'need not achieve meticulous specificity, which

would come at the cost of flexibility and reasonable breadth.'") (quoting *Dickerson v.

Napolitano*, 604 F.3d 732, 747 (2d Cir. 2010)). As such, the statute is not required to

exhaustively list trade behaviors that it prohibits. Instead, the Spoofing Statute outlaws a particular intent, namely, placing orders with the intent to cancel them before execution. *See Calimlim*, 538 F.3d at 711 ("The presence of a scienter element to the offense makes the [Defendants' vagueness] burden very difficult to carry.") (citing *Screws v. United States*, 325 U.S. 91, 65 S. Ct. 1031, 89 L. Ed. 2d 1495 (1945) (rejecting vagueness challenge to what is now 18 U.S.C. § 242, in part, due to its scienter requirement)). The Complaint provides sufficient circumstantial evidence to plausibly allege that Defendant Oystacher possessed such an intent.

Defendants also maintain that "[t]he parenthetical description in the statute (*i.e.*, 'bidding or offering with the intent to cancel before execution') does not cure the vagueness of the text." (R. 164-1 at 25 (footnote omitted).) Defendants claim that "[i]t is hardly clear that this description *defines* spoofing." (R. 164-1 at 26.) "In fact," they conclude, "the description more likely offers an example of what may *sometimes* constitute 'spoofing.'" (*Id.*) To illustrate this point, Defendants highlight various order-types they allege inherently involve an intent to cancel before execution, but do not violate the Spoofing Statute. Specifically, Defendants point to "stop-loss orders[,] . . . partial fill orders[,] . . . fill-or-kill orders[,] . . . orders placed for price discovery, and orders placed to test system parameters." (*Id.*) The Complaint, however, does not allege that Defendant Oystacher placed any of these order-types. Rather, it alleges that he entered bids and offers with the intent to cancel those bids and offers before execution in violation of the Spoofing Statute. "Because First Amendment rights are not at stake, the Court must assess whether the statute is unconstitutional as applied to [Defendant's] conduct, not to the conduct of the 'hypothetical legitimate traders' who voiced concerns about the statute's applicability to practices such as partial-fill and stop-loss orders[.]" *Coscia*, 100 F. Supp. 3d at 658 (citing *United States v. Mazurie*, 419 U.S. 544, 550, 95 S. Ct. 710, 42 L. Ed. 2d 706 (1975)).

Indeed, "[a party] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id*. (quoting *Hoffman Estates*, 455 U.S. at 495). Defendants' as-applied vagueness challenge is limited to Defendant Oystacher's alleged trading conduct, rendering Defendants' reference to other order-types irrelevant. *See Borzych v. Frank*, 439 F.3d 388, 392 (7th Cir. 2006) ("It would be no more than an advisory opinion to attempt to resolve now all questions that could arise under the regulation.") (citing *Ayotte v. Planned Parenthood*, 546 U.S. 320, 126 s. Ct. 961, 967–68, 163 L. Ed. 2d 812 (2006)). Moreover, Defendants' reliance on various First Amendment cases involving facial challenges is misplaced. *See City of Chicago v. Morales*, 527 U.S. 41, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999); *Smith v. Goguen*, 415 U.S. 566, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972); *Ashton v. Kentucky*, 384 U.S. 195, 86 S. Ct. 1407, 16 L. Ed. 2d 469 (1966). As noted, this is not a First Amendment issue, and the Court must consider Defendants' vagueness challenge in light of the facts at hand. Doing so makes clear that Defendant Oystacher's alleged trading violated the parenthetically proscribed conduct.

Further, order-types such as stop-loss orders, partial fill, or fill-or-kill orders do not inherently require entering them with the intent to cancel before execution as prohibited by the Spoofing Statute. Instead, traders enter these orders with the intent to execute them under certain conditions, only cancelling them later in the absence of those conditions. *See* CME Group Glossary, *available at* http://www.cmegroup.com/education/glossary.html (Defining a "stop-loss order" as "[a]n order that becomes a market order when a particular price level is reached" and a "fill-or-kill order" as "[a] designation, added to an order, instructing the broker to fill the order immediately in its entirety or not [at] all. If the order is not filled immediately in its entirety, it is

cancelled.") (last visited Aug. 23, 2016); *see also* CME Group iLink Order Qualifiers, *available at* http://www.cmegroup.com/confluence/display/EPICSANDBOX/iLink+-+Order+Qualifiers#iLink-OrderQualifiers-FAKPartialFill (Defining "partial fill orders" as orders that "match[] partially with all available quantity on the book and the remainder is eliminated") (last visited Aug. 23, 2016); (R. 189-1 at 18 ("A stop-loss order is entered with the intent to execute if the price falls (or rises) to a certain level. A partial fill order is entered with the intent to execute any or all of the quantity of the order, with the cancellation of any remainder. A fill or kill order is entered with the intent to execute all of the order or none of it."); *Coscia*, 100 F. Supp. 3d at 659 ("For instance, although Fill or Kill orders must be filled immediately or the entire order is cancelled, they are not entered with the intent to cancel. The same is true of partial-fill orders, which are entered with the intent to consummate a trade, not with the intent to cancel the order altogether.") In other words, if given the choice, traders placing these order-types would execute them. This is not the case alleged against Defendant Oystacher. In fact, the CFTC's Complaint alleges he actively did *not* want his spoof orders to execute, under any conditions. Specifically, Defendant Oystacher "placed the spoof orders in a manner to avoid being filled by placing them as passive orders at or near the best bid or ask price level, behind existing orders, and canceling them less than a second after they were placed." (R. 1 at ¶ 61, ¶ 89.); *see also* (*Id*. at ¶ 62 ("This meant that Defendants' 'spoof orders' were at risk for being filled only if the pending orders at those price levels were filled first, based on the Exchanges' [first-in-first-out] rules.").) As such, there is a fundamental difference in intent at the time of order-entry between legitimate order-types and Defendant Oystacher's spoof orders as alleged in the Complaint. *See Coscia*, 100 F. Supp. 3d at 659 ("[Defendant's] alleged 'intent to cancel' sets his conduct apart from the legitimate trading practices described in his memorandum.") Thus,

taking the CFTC's allegations as true, it is clear the Spoofing Statute's parenthetical description proscribed Defendant Oystacher's trading conduct.

Defendants next contend that "[t]he Spoofing Statute is vague, because it fails to give notice of what is 'commonly known to the trade as' or 'of character of' spoofing." (R. 164-1 at 28.) Defendants reason that "the Spoofing Statute outlaws 'spoofing', in and of itself, [so] conduct that 'is of the character of . . . spoofing' must be conduct that is *not* spoofing, but is somehow *like* spoofing." (R. 164-1 at 28 (emphasis in original).) "Likewise," Defendants continue, "conduct that is 'commonly known to the trade as, 'spoofing' must also be something *other* than 'spoofing.'" (*Id*. (emphasis in original).) The Complaint, however, charges Defendant Oystacher with "spoofing." Trading that is "*like* spoofing" or something "*other* than spoofing," therefore, is irrelevant. (*Id*. (emphasis in original).) Specifically, Count One refers to Defendant Oystacher's "spoofing scheme" and charges Defendant Oystacher with "engag[ing] in spoofing during the relevant period by, among other things, bidding or offering with the intent to cancel the bid or offer before execution, while placing orders during the relevant period[.]" (R. 1 at ¶ 94, ¶ 95.); *see also* (*Id*. at ¶ 2 ("From December 2011 through at least January 2014, Igor B. Oystacher and . . . 3 Red Trading LLC, intentionally and repeatedly engaged in a manipulative and deceptive spoofing scheme while placing orders for and trading futures contracts on multiple registered entities.").); (*Id*. at ¶ 3 ("This strategy allowed Defendants to buy or sell futures contracts in quantities and/or at price levels that would not have otherwise been available to them in the market, absent the spoofing conduct.").); (*Id*. at ¶ 4 ("Oystacher and 3 Red applied their pattern of manipulative and deceptive spoofing on at least fifty-one trading days[.]").); (*Id*. at ¶ 52 ("Oystacher and 3 Red engaged in manipulative or deceptive trading strategies that spoofed various markets while placing orders for, and trading futures contracts[.]").); *Id*. at ¶ 63 ("Indeed,

in some of the markets, the average duration of the spoof events for the spoof orders . . . was significantly less than one second[.]").).  Indeed, the CFTC continues to stress that it "alleges that Defendants engaged in spoofing."  (R. 189-1 at 19.)  The Court does not look to the hypothetical trader or hypothetical conduct that is "commonly known to the trade as" or "of the character of" spoofing and, therefore, does not address the constitutionality of those parts of the Spoofing Statute.[2]

As a result, the Spoofing Statute is not unconstitutionally vague as applied to Defendant Oystacher's alleged trading conduct.[3]

## II.    CFTC Regulation 180.1 is Not Unconstitutionally Vague

Next, Defendants argue that CFTC Regulation 180.1 is unconstitutionally vague.  (R. 164-1 at 35.)  Specifically, Defendants contend that "[f]or the same reasons that the CFTC's claims do not fit squarely within the language of the Spoofing Statute, they do not fit squarely within the language of Regulation 180.1."  (*Id*.)  As a result, Defendants conclude, "the CFTC's claims under Regulation 180.1 fail as a matter of law, because it is vague and does not enable industry participants like Mr. Oystacher to conform their trading to its requirements."  (R. 164-1 at 36.)  Similar to their Spoofing Statute challenge, however, Defendants' vagueness claim against CFTC Regulation 180.1 fails.

As described earlier, CFTC Regulation 180.1(a)(1) provides, in relevant part, as follows:

---

[2] If the CFTC intends to allege that Defendants violated the Spoofing Statute by engaging in conduct that "is of the character of" or "commonly known to the trade as" spoofing, the Court reserves decision on the constitutionality of these prongs in the event it files an amended complaint.  *See CFTC v. Trade Exch. Network, Ltd.*, 117 F. Supp. 3d 29, 34–35 (D.D.C. 2015) (Successfully applying similar statutory language and finding that a particular financial instrument was "of the character of, or is commonly known to the trade as" an "option," under Section 4c(b) of 7 U.S.C. § 6c(b) (2012) which states "[n]o person shall offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under [the CEA] which is of the character of, or is commonly known to the trade as, an "option[.]").

[3] The Court does not address Defendants' arguments regarding the CFTC's Policy Statement, as the Court does not rely on it in finding that the Spoofing Statute is not unconstitutionally vague.  (R. 164-1 at 31.)

> (b) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> > (2) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud[.]

17 C.F.R. § 180.1(a)(1); *see also Kraft Foods Grp., Inc.*, 153 F. Supp. 3d at 1007 ("In publishing Regulation 180.1, the CFTC explained that 'Final Rule 180.1 prohibits fraud and fraud-based manipulations.'") (citing *Final Rule*, 76 Fed. Reg. at 41,400; 17 C.F.R. § 180.1).

Defendants do not support their contention that the Regulation is vague. Instead, Defendants' argument amounts to one page of conclusory statements that the Regulation fails to provide notice to Defendant Oystacher, relying on its earlier arguments regarding the Spoofing Statute. The Spoofing Statute, however, is an entirely different law. Regardless, CFTC Regulation 180.1 is not unconstitutionally vague given its scienter requirement, clear prohibition of manipulative schemes, and relation to Section 10(b) of the Securities Exchange Act and the Security and Exchange Commission's ("SEC") related Rule 10b-5.

CFTC Regulation 180.1 includes a scienter requirement, namely, outlawing intentional or reckless use or employment of "any manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1(a)(1). Similar to the Spoofing Statute's intent requirement, the Regulation's intent element mitigates any vagueness claim launched against it, even with the included "reckless[]" standard. *See Bd. Of Trustees of Fire Fighters' Pension Fund of Vill. of Arlington Heights, Cook County, Ill. v. Poder*, No. 88 C 3848, 1988 WL 115288, at *2 (N.D. Ill. Oct. 26, 1988) (Assessing a similar regulation, 17 C.F.R. § 240.10b-5 (1987), stating "Plaintiff is also required to allege scienter-namely that the defendant acted with an intent to deceive, manipulate, or defraud. This element may be satisfied alleging 'reckless behavior.' Narrowly construed,

reckless behavior amounts to knowledge that the Plaintiff will be misled.") (citing *Panter v.*

*Marshall Field & Co.*, 646 F.2d 271, 282 (7th Cir.), *cert denied* 454 U.S. 1092 (1981))

(quotation marks omitted). As explained above, "because direct evidence of intent is often

unavailable, intent to defraud 'may be established by circumstantial evidence and by inferences

drawn from examining the scheme itself[.]'" *Fidlar Techs.*, 810 F.3d at 1079 (quoting *Pust*, 798

F.3d at 600). Here, the Complaint depicts Defendant Oystacher's manipulative trading scheme

and intent to defraud through various means described in more detail above.

Further, Regulation 180.1 is "nearly identical" to Section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, which have

both passed constitutional muster. *Kraft Foods Grp., Inc.*, 153 F. Supp. 3d at 1008–09.

Specifically, the court in *Kraft Foods*, assessing the applicable pleading standard under CFTC

Regulation 180.1, stated:

> This Court's plain reading of the [Section 6(c)(1) and Rule 180.1] text finds
> support in an analysis of the nearly identical provisions enacted as part of the
> Securities Exchange Act of 1934—Section 10(b) and Rule 10b-5. Both Section
> 6(c)(1) of the CEA and Section 10(b) of the [Securities] Exchange Act prohibit
> the use of "any manipulative or deceptive device or contrivance" in contravention
> of the regulations established by their respective agencies. *See* 7 U.S.C. § 9(c)(1);
> 15 U.S.C. § 78j. Likewise, CFTC Regulation 180.1 clarifies that Section 6(c)(1)
> prohibits the use of "any manipulative device, scheme, or artifice to defraud," and
> SEC Rule 10b-5 explains that Section 10(b) forbids the use of "any device,
> scheme, or artifice defraud." *See* 17 C.F.R. § 180.1; 17 C.F.R. § 240.10b-5.
> When Congress borrows specific terms of art or legal phrasing (as it did in
> drafting Section 6(c)(1)), a presumption may arise that Congress "knows and
> adopts the cluster of ideas that were attached to each borrowed word." *Morissette
> v. United States*, 342 U.S. 246, 263, 72 S. Ct. 240, 96 L. Ed. 288 (1952); *United
> States v. Johnson*, 376 F.3d 689, 693 (7th Cir. 2004) ("when Congress utilizes a
> common law term or a legal term with an established meaning, the courts should
> apply the accepted definition absent a clear indication to the contrary"). In this
> instance, neither the operative language, nor its context, gives any "clear
> indication" to contravene the Court's presumption, and thus, case law interpreting
> Section 10(b) and Rule 10b-5 remains instructive here.

*Id.* (citing 156 Cong. Rec. S3333-01) (providing Senator Cantwell's remarks that Section 6(c)(1)'s underlying legislation "tracks the Securities [Exchange] Act[.]").  Notably, the CFTC explicitly intended to "to model final Rule 180.1 on SEC Rule 10b-5."  *Id.* (citing *Final Rule*, 76 Fed. Reg. at 41,399).  Multiple courts have found that Section 10(b) and Rule 10b-5 are not unconstitutionally vague.  *See Todd & Co., Inc. v. SEC*, 557 F.2d 1008, 1013 ("The language of Section 8 of the Rules of Fair Practice is not substantially different from that contained in s 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), or the Commission's own free-wheeling Rule 10b-5, 17 C.F.R. § 240.10b-5, neither of which are unconstitutionally vague.") (citing *United States v. Persky*, 520 F.2d 283 (2d Cir. 1975)); *see also Persky*, 520 F.2d at 287 (rejecting a vagueness challenge to Section 10(b) and Rule 10b-5, as "[n]o honest and reasonable citizen could have difficulty in understanding the meaning' of the rules' terms[.]")  Moreover, courts have consistently interpreted and applied Section 10(b) and Rule 10b-5 successfully.  *See Kraft Foods Grp., Inc.*, 153 F. Supp. 3d at 1009 ("For many years now, federal courts interpreting Section 10(b) and Rule 10b-5 have routinely found that those provisions create a cause of action that must sound in fraud."); *see also Glickenhaus & Co. v. Household Int'l., Inc.*, 787 F.3d 408, 414–15 (7th Cir. 2015) (citing *Halliburton Co. v. Erica P. John Fund., Inc.*, 134 S. Ct. 2398, 2407–08, 189 L. Ed. 2d 339 (2014) ("[W]e have long recognized an implied private cause of action to enforce the provision and its implementing regulation.")).  Given the nearly identical language and foundation between the SEC's Rule 10b-5 and the CFTC's Regulation 180.1, the Court holds that the latter is not unconstitutionally vague, as no reasonable individual would have difficulty understanding its proscribed conduct.  *See Lim*, 444 F.3d at 915.

**III.    The Spoofing Statute is Not an Unconstitutional Delegation of Power**

Finally, Defendant argues that "[f]or essentially the same reasons that the Spoofing Statute is unconstitutionally vague, the Spoofing Statute and its corresponding grant of regulatory authority lack any intelligible principle and therefore effectuate an unconstitutional delegation of power to both the CFTC and the federal courts." (R. 164-1 at 37.) Defendant further contends that "[t]here is no adequate definition of spoofing and no 'intelligible principle' in the Spoofing Statute." (*Id.* at 39.) "Because there can be no serious contention that the parenthetical description in the spoofing Statute could actually be applied as written," Defendant concludes, "it does not provide an intelligible principle for the CFTC to distinguish legitimate from illegitimate trading." (*Id.* at 41.) The Court disagrees.

Pursuant to the Constitution, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. Art. I, § 1. As such, "'the integrity and maintenance of the system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989) (quoting *Marshall Field &Co. v. Clark*, 143 U.S. 649, 12 S. Ct. 495, 36 L. Ed. 294 (1892)). The nondelegation doctrine, however, does "not prevent Congress from obtaining assistance from other branches of government." *United States v. Esfahani*, No. 05 CR 0255, 2006 WL 163025, at *1 (N.D. Ill. Jan. 17, 2006) (citing *Mistretta*, 488 U.S. at 372). Indeed, "[i]f Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 72 L. Ed. 624 (1928); *see also United States v. Goodwin*, 717 F.3d 511, 516 (7th Cir. 2013) (citing *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 472, 121

S. Ct. 903, 149 L. Ed. 2d 1 (2001)). "In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government co-ordination." *Id*. at 406. Put differently, "[i]n applying this 'intelligible principle' test to delegations of authority by Congress, jurisprudence is 'driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives.'" *Esfahani*, 2006 WL 163025, at *2 (quoting *Mistretta*, 488 U.S. at 372). Ultimately, "[a] delegation is 'constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority.'" *Goodwin*, 717 F.3d at 517 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105, 67 S. Ct. 133, 91 L. Ed. 103 (1946)).

In light of the alleged facts, the Spoofing Statute satisfies all three. The CEA's congressional findings and statement of purpose govern the Act's Spoofing Statute sub-part. Specifically, they provide the following:

(a)     Findings

The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.

(b)     Purpose

It is the purpose of this chapter to serve the public interests described in subsection (a) through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [Commodity Futures Trading Commission]. To foster these public interests, it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial

integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.

7 U.S. §§ 5(a), (b); *see also CFTC v. Kraft Foods Grp., Inc.,* — F. Supp. 3d —, No. 15 C 2881, 2016 WL 3907027, at *5 (N.D. Ill. July 19, 2016) (citing 7 U.S.C. § 7(b)). First, the CEA's purpose statement clearly delineates its general policy. *See Goodwin*, 717 F.3d at 517 (Looking to the Sex Offender Registration and Notification Act's statement of purpose and finding that the act "provides an intelligible principle"). Generally, the CEA's purpose is to "serve the public interest." 7 U.S.C. § 5(b). This alone constitutes an intelligible principle. *See Goodwin*, 717 F.3d at 517 (citing *Nat'l. Broad Co. v. United States*, 319 U.S. 190, 216–17, 63 S. Ct. 997, 87 L. Ed. 1344 (1943) (statutory purpose stating that regulators act "in the public interest" qualifies)). The CEA, however, provides a number of additional specific aims that further demarcate the Act's guiding principle. *See* 7 U.S.C. § 5(b). These include, in relevant part, deterring and preventing price manipulation and other disruptions to market integrity, ensuring financial integrity of all transactions, avoiding systemic risk to transaction integrity, protecting market participants from fraudulent or abusive sales practices, and promoting fair competition. *Id*. These stated intentions provide an "intelligible principle" focused on preserving market integrity and protecting market participants by preventing fraudulent and abusive trading practices. *J.W. Hampton, Jr. & Co.*, 276 U.S. at 409. Second, the CEA clearly spells out the executive branch agency designated to act and fulfill the above purposes: the "Commodity Futures Trading Commission." *See* 7 U.S.C. §§ 2, 5(b). Finally, the CEA clearly establishes the boundaries of 1) the CFTC's general delegated authority through its granular purpose statement and 2) the CFTC's particular delegated authority under the Spoofing Statute through its parenthetical

guidance.  Specifically, the CEA's precise market integrity objectives listed above limit the CFTC's general authority.  *See* 7 U.S.C. § 7(b).  Likewise, the CFTC's particular authority under the Spoofing Statute is bounded by the statute's parenthetical definition, as described in more detail earlier.  Rather than enable the CFTC to unreservedly designate any order-type as spoofing, as Defendant implies, the Spoofing Statute tailors spoofing to only those orders that market participants enter with the intent to cancel before execution.  In other words, this definition provides another principle, narrowed by an intent requirement, to which the CFTC's conduct must "conform."  *J.W. Hampton, Jr. & Co.*, 276 U.S. at 409.  In conjunction, the CEA and the Spoofing Statute sub-part provide an intelligible principle guiding the CFTC's conduct and preventing the Commission from enacting any "legislative Powers" constitutionally reserved for Congress.  U.S. CONST. Art. 1, § 1.  As a result, the Spoofing Statute does not run afoul of the nondelegation doctrine.[4]

## CONCLUSION

For the foregoing reasons, the Court denies the CFTC's motion for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

**DATED:  August 23, 2016**                                                      **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge

---

[4] The Court does not address Defendants' arguments regarding the CFTC's reliance on "witness testimony," as, at this stage, the Court only relies on the factual allegations in the Complaint.  Neither the Complaint nor the Court in this Opinion rely on any individual market participant testimony regarding spoofing or Defendants' conduct.