# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>               PLAINTIFF,<br><br>    v.<br><br>IGOR B. OYSTACHER , and 3 RED TRADING LLC,<br><br>              DEFENDANTS. | Case No. 15-cv-09196<br><br>Hon. Amy J. St. Eve |

## CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST IGOR B. OYSTACHER AND 3 RED TRADING LLC

### I.      INTRODUCTION

On October 19, 2015, Plaintiff U.S. Commodity Futures Trading Commission (the "Commission" or "CFTC") filed its Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties under the Commodity Exchange Act (the "Act") against Igor B. Oystacher ("Oystacher") and 3 Red Trading LLC ("3 Red") (collectively "Defendants") (Dkt. #1) for violations of Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. § 6c(a)(5)(C) and § 9(1) (2012) and CFTC Regulation 180.1, 17 C.F.R. § 180.1 (2015).

On November 9, 2015, Plaintiff filed a Motion for Preliminary Injunction (Dkt. #20). The Court conducted a nine-day preliminary injunction hearing on April 8, 25- 29, May 4, 6 and May 12, 2016. At the contested hearing, Plaintiff introduced evidence that supported the allegations of the Complaint, that the Defendants violated the Act while trading: (1) the Commodity Exchange Inc.'s ("COMEX") March 2012 copper futures contract ("copper") on December 1, 2, 5-9, 12-16, and

19-20, 2011; (2) the New York Mercantile Exchange's ("NYMEX") spot crude oil futures contract ("crude oil") on May 7, 9-11, 2012; (3) the NYMEX's spot month natural gas contract ("natural gas") on November 30 and December 3-4, 2012; (4) the CBOE Futures Exchange's ("CFE") March 2013 volatility index futures contract ("VIX") on February 19-22, 25-28, and March 1, 4-5, 2013, and the April 2013 VIX contract on March 6, 7, 11, 12, 18 and 21, 2013; and (5) the Chicago Mercantile Exchange's ("CME") spot month E-Mini S&P 500 futures contract ("E-Mini S&P 500") on June 11-12, 2013, December 16-19, 2013, and January 6-10, 2014 (collectively "the relevant markets" and "the relevant period"). The Defendants introduced evidence challenging the allegations in the Complaint.

On July 12, 2016, the Court denied Plaintiff's Motion for Preliminary Injunction, ordered that Defendants maintain certain trading surveillance reports and compliance tools across all markets Defendants trade, required 3 Red's Chief Compliance Officer to file periodic affidavits, and ordered that Oystacher limit his trading to the E-Mini S&P 500 and CME's Ten Year T-Note Futures Contracts markets except with the Court's permission. (Dkt. #195)

## II. CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendants without a trial on the merits or any further judicial proceedings, Defendants:

1. Consent to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendants ("Consent Order");

2. Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3. Acknowledge service upon them of the summons and Complaint;

4. Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2012);

5. Admit the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act, 7 U.S.C. § 13a-1 (2012);

6. Admit that venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, 7 U.S.C. § 13a-1(e) (2012);

7. Waive:

    (a)    Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. §§ 148.1 et seq. (2014), relating to, or arising from, this action;

    (b)    Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

    (c)    Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

    (d)    Any and all rights of appeal from this action, including but not limited to: the Court's rulings related to the Preliminary Injunction and Motion for Judgment on the Pleadings, as well as this Consent Order;

8. Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of the Consent Order and for any other purpose relevant to this action, even if Defendants now or in the future reside outside the jurisdiction of this Court;

9. Agree that they will not oppose enforcement of this Consent Order by alleging that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waive any objection based thereon;

10. Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party.  Defendants shall undertake all steps necessary to ensure that their agents and employees under their authority or control understand and comply with this agreement;

11. Agree to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 46 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against any of them, whether inside or outside the United States;

12. Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants in any other proceeding;

13. By consenting to the entry of this Consent Order, Defendants neither admit nor deny the allegations of the Complaint, the Findings of Fact, and the Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which they admit.  Further, Defendants agree and intend that the allegations contained in  the Complaint and all of the Findings of Fact and Conclusions of Law contained in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of:(a) any proceeding pursuant to Section 8a of the Act, 7 U.S.C. § 12a (2012), and/or Part 3 of the Regulations, 17 C.F.R. §§ 3.1 *et seq.* (2014); and/or (b) any proceeding to enforce the terms of this Consent Order.  Defendants do not consent to the

use of this Consent Order, or the Findings of Fact and Conclusions of Law in this Consent Order, as the sole basis for any other proceeding brought by the Commission.

14. Consent to imposition of the undertakings and payment of civil monetary penalties, in the amounts specified below.

## III.    FINDINGS AND CONCLUSIONS

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.   The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction, civil monetary penalty and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

      **A.**      <u>**Findings of Fact**</u>

           **1.**      **The Parties**

15. Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with administering and enforcing the Act, as amended, 7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2015).

16. Defendant 3 Red Trading LLC is a proprietary trading firm that employs both manual traders – where humans make trading decisions – and algorithmic traders – where computer algorithms make trading decisions.  It has never been registered with the Commission in any capacity.

17. Defendant Igor Oystacher serves as 3 Red's President, Chief Executive Officer and principal trader.  During the relevant time period, he was a principal and majority owner of 3 Red. He has never been registered with the Commission in any capacity.  Defendant Oystacher is a

manual trader. As such, he manually executes trades based on his own observations, assisted with trading tools. During the relevant period, he traded futures contracts on copper, crude oil, natural gas, VIX, and E-Mini S&P 500, on designated contract markets or "exchanges," and was the largest or among the largest traders in the respective contracts (as measured by the number of contracts traded) during the relevant period.

### 2.     Defendants' Trading

18. The trading on electronic trading platforms transmits market participant orders to a matching engine that aggregates the orders from across the market in each contract, then matches the orders to buy with orders to sell at the same price, generally following a "first-in, first-out" priority. Moreover, a relationship also exists between the price of an order and its execution. A price either can be "aggressive" or "passive" depending on where the price is located compared to the current "bid-ask spread" between the highest priced bid to buy and the lowest price offer (or "ask") to sell. A passive order cannot be immediately matched upon receipt by the exchange. Generally, the higher the limit price on a buy order, the more aggressive it is, and the lower the limit price on a sell order, the more aggressive it is.

19. The trading platform also distributes information back to market participants, such as order matches and executions, cancellations, changes in quantities, and changes in prices. From the perspective of market participants trading on the electronic platform, only the number of orders at various price levels and the number of contracts at each price level are visible; the identity of the originating market participant for each order is not. Market participants view this data through the market data feed and incorporate trading strategies based, in part, on that information. One factor that at least some market participants consider is "book pressure", which can indicate whether there exists more buying or selling interest in the market for a particular product, using the number of orders at each price level in the order book on both the buy and sell sides.

6

20. Oystacher and 3 Red manually traded these futures markets, using a commercially available trading platform, which included a commonly-used function designed to prevent a trader's own orders from matching with one another. In the industry, this type of software is known as a "wash blocker" and is often offered by the exchanges themselves. Oystacher used this functionality to place certain of the orders charged in the Complaint, which automatically and almost simultaneously cancelled existing orders on the opposite side of the market (that would have matched with the new orders).

21. Oystacher and 3 Red engaged in trading across all relevant markets during the relevant period, which included placing orders on both the buy and sell sides of the market. On one side, Oystacher placed one or more orders as passive orders at or near the best bid or offer price, behind existing orders placed by other market participants. These orders – characterized in the complaint as "cancel-side" or "spoof" orders –would not be filled until the existing orders at those price levels were filled or cancelled first. However, the size and number of the cancel-side orders created an impression of market depth and book pressure on that side of the market. Subsequently, on the other side of the market, Oystacher placed new orders – characterized in the complaint as "the trade side" or "flip" order(s) – which as a result of the wash blocker functionality would simultaneously (within 5 milliseconds) cancel any opposite order(s) at the same or better price that then traded against market participants who had placed orders on the same side as the cancel-side orders.

22. Oystacher's trading has triggered inquiries or investigations in every exchange on which he has traded. Numerous exchanges have sanctioned Oystacher and 3 Red for their improper trading activities. Oystacher was aware of all of these investigations.

23. Oystacher's particular quantities of cancel and trade-side order entries illustrate a number of characteristics across the markets charged in the Complaint. Specifically, Oystacher:

1) entered more cancel-side orders than all other market participants engaged in flip orders;
2) cancelled larger portions of his total entered orders upon flipping as compared to all other
participants in each relevant market; 3) ordered a higher number of cancel-side contracts one
second before the impending flip event as compared to earlier seconds – a phenomenon described
as accelerating his cancel-side order entries the closer he got to his flip event; 4) created a cancel-
side order book imbalance both in the overall market and within his own trading by making cancel-
side order entries that were much larger in magnitude than the market's total number of orders
already resting in the limit order book at the event price or better at the time he entered them; and
5) entered more trade-side orders after flip events than during non-flip transactions.

24. In addition, Oystacher made use of so-called "iceberg" or "hidden-quantity" orders
offered by certain designated contract markets – *i.e.*, copper, crude oil, natural gas, and E-Mini S&P
500 on the CME, but not the VIX on the CFE – whose order quantities (*i.e.*, number of contracts)
are only partially visible in the order book to other market participants. Oystacher used the iceberg
function at a higher rate in his trade-side orders compared to his cancel-side orders in the markets
that allowed such orders. As such, Oystacher's trade-side orders displayed a lower quantity of their
contracts compared to his non-flip orders' displayed quantities.

25. As described in the Complaint, the following is one example of how Oystacher and 3
Red employed a manipulative or deceptive spoofing strategy on each of the relevant dates to buy or
sell futures contracts in quantities and/or at price levels that would have otherwise not been
available to them in the market, absent the conduct.

26. At 8:02:34.360 a.m. on November 30, 2012, Defendants were short 10 futures contracts
in natural gas with additional pending orders to sell 182 contracts. Beginning at 8:02:34.576 a.m.,

Defendants proceeded to place seven visible orders to sell a total of 103 contracts behind other resting orders at the existing best offer price of $3.671, as illustrated below:

| | State of the Visible Order Book Prior to Defendants' Orders 08:02:34.360 | | | | Defendants' Order Entry Activity 08:02:34.576 – 08:02:34.918 | | | |
| | ORDER BOOK | | | | OYSTACHER | | | |
| Price | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts |
|---|---|---|---|---|---|---|---|---|
| 3.675 | | | 29 | 135 | | | | |
| 3.674 | | | 20 | 35 | | | | |
| 3.673 | | | 17 | 38 | | | | |
| 3.672 | | | 18 | 32 | | | | |
| 3.671 | | | 5 | 9 | | | 7 | 103 |
| 3.670 | 8 | 18 | | | | | | |
| 3.669 | 18 | 26 | | | | | | |
| 3.668 | 19 | 33 | | | | | | |
| 3.667 | 22 | 32 | | | | | | |
| 3.666 | 15 | 24 | | | | | | |
| TOTALS: | 82 | 133 | 89 | 249 | | | 7 | 103 |

27. Defendants' seven cancel-side orders increased the visible market depth (measured in contracts offered) at the best offer price by more than 1100% compared to what was visible to market participants at that same price before Defendants placed these cancel-side orders.

28. After Defendants' cancel-side orders appeared in the order book, other market participants placed orders to sell, and a new best sell/offer price of $3.670 was established, as shown below:

| | State of the Visible Order Book After Defendants' Orders 08:02:34.951 | | | |
| | ORDER BOOK | | | |
| Price | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts |
|---|---|---|---|---|
| 3.674 | | | 19 | 34 |
| 3.673 | | | 17 | 32 |
| 3.672 | | | 21 | 41 |

| Price | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts |
|---|---|---|---|---|
| **3.671** | | | 16 | 119 |
| **3.670** | | | **3** | **3** |
| **3.669** | **9** | **21** | | |
| **3.668** | 23 | 39 | | |
| **3.667** | 20 | 30 | | |
| **3.666** | 17 | 25 | | |
| **3.665** | 13 | 28 | | |
| **TOTALS:** | **82** | **143** | **76** | **229** |

29. The market for natural gas futures at 8:02:35.281 a.m., immediately before Defendants canceled their cancel-side orders, looked as follows:

| State of the Visible Order Book Prior to Defendants' Cancels 08:02:35.281 | | | | |
|---|---|---|---|---|
| ORDER BOOK | | | | |
| Price | Buy Orders | Buy Contracts | Sell Orders | Sell Contracts |
| **3.674** | | | 20 | 35 |
| **3.673** | | | 19 | 34 |
| **3.672** | | | 21 | 41 |
| **3.671** | | | 18 | 121 |
| **3.670** | | | **4** | **4** |
| **3.669** | **9** | **21** | | |
| **3.668** | 23 | 39 | | |
| **3.667** | 20 | 30 | | |
| **3.666** | 17 | 25 | | |
| **3.665** | 13 | 28 | | |
| **TOTALS:** | **82** | **143** | **82** | **235** |

30. At 8:02:35.304 a.m., market data reflects that Defendants canceled their seven cancel-side orders at $3.671, although they had been pending less than 750 milliseconds, and none had resulted in any fills. Market data indicates that over the next three milliseconds, Defendants aggressively "flipped" and crossed the spread by placing two buy orders for a total of 50 contracts at a price of $3.671. Because Defendants' flip orders to buy would have been matched against their

pending cancel-side orders to sell at the same price, the wash blocker function in their trading platform automatically canceled these cancel-side orders. In this example, Defendants were able to almost simultaneously place new orders and cancel existing opposite orders at the same or better price with a single button push.

31. Over the next ten seconds, Defendants' aggressive flip orders to buy 50 contracts were filled with 39 contracts at $3.671 and 4 contracts at 3.670. About a second after the last fill, Oystacher and 3 Red canceled the remaining portion of one of the flip buy orders.

32. The following table illustrates Defendants' cancel and flip activity as well as the state of the Order Book at 08:02:35.309 a.m., after Defendants' flip orders had been mostly filled and subsequently canceled:

| | State of the Visible Order Book After Defendants' Cancel & Flip 08:02:35.309 | | | | Defendants' Cancel & Flip Activity 08:02:35.304 – 08:02:35.307 | | | |
|---|---|---|---|---|---|---|---|---|
| | ORDER BOOK | | | | OYSTACHER | | | |
| **Price** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** | **Buy Orders** | **Buy Contracts** | **Sell Orders** | **Sell Contracts** |
| **3.676** | | | 19 | 77 | | | | |
| **3.675** | | | 26 | 132 | | | | |
| **3.674** | | | 20 | 35 | | | | |
| **3.673** | | | 18 | 33 | | | | |
| **3.672** | | | **18** | **38** | | | | |
| **3.671** | 1 | 1 | | | **2** | **50** | ~~7~~ | ~~103~~ |
| **3.670** | 3 | 4 | | | | | | |
| **3.669** | 15 | 28 | | | | | | |
| **3.668** | 23 | 39 | | | | | | |
| **3.667** | 20 | 30 | | | | | | |
| **TOTALS:** | **62** | **102** | **101** | **315** | **2** | **50** | | |

11

33. After Defendants' flip orders were mostly filled and then partially canceled, the new lowest sell price was $3.672. In this instance, Defendants purchased 43 contracts, most at a price not available before Defendants entered their cancel-side orders.

### B. Conclusions of Law

#### 1. Jurisdiction and Venue

34. This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

35. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants resided in this jurisdiction at the time of the acts and practices in violation of the Act, Defendants transacted business in this District, and certain transactions, acts, and practices alleged in the Complaint and described herein, occurred, are occurring, and/or are about to occur within this District.

#### 2. Violations of Sections 4c and 6(c)(1) and Regulation 180.1 of the Commodity Exchange Act (Spoofing and Employment of a Manipulative or Deceptive Device)

36. Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012), makes it unlawful for any person to engage in trading or conduct on a registered entity that "is of the character of or commonly known to the trade as 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)."

37. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2015), make it unlawful for any person to intentionally or recklessly employ, or attempt to

use or employ any manipulative device, scheme, or artifice to defraud in connection with commodity futures.

38. By the conduct described in the Complaint and in paragraphs 18 through 33 above, Defendants entered bids or offers with the intent to cancel the bids or offers before execution in violation of Section 4c(a)(5)(C), 7 U.S.C. § 6c(a)(5)(C).

39. By the conduct described in the Complaint and in paragraphs 18 through 33 above, Defendants intentionally or recklessly used or employed, or attempted to use or employ, a manipulative device, scheme, or artifice to defraud in connection with contracts for future delivery on or subject to the rules of a registered entity in violation of Section 6(c)(1)(a) of the Act, 7 U.S.C. § 9(1)(a) and CFTC Regulation 180.1, 17 C.F.R. § 180.1.

40. Unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV.     PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

41. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the CEA, as amended, 7 U.S.C. § 13a-1:

> (a)     Defendants are permanently restrained, enjoined and prohibited from placing passive displayed order(s) at the best price or near the best price on one side of the market behind existing orders in such size and/or number that it creates a false or misleading impression of market depth and/or book pressure and then subsequently cancelling those orders simultaneously or nearly simultaneously with the entry of an order at the same or better price on the opposite side of the market in violation of Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012).

> (b)     Defendants are permanently restrained, enjoined and prohibited from trading in a way that creates a false or misleading impression of market depth and/or book pressure in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), or Regulation 180.1, 17 C.F.R. § 180.1 (2015).

(c)    For a period of three (3) years commencing from the date of the entry of this Consent Order, James G. Lundy is hereby appointed as an independent monitor (the "Monitor"). The Monitor will assess and monitor 3 Red's and Oystacher's trading (through 3 Red or any accounts Oystacher owns or controls) for the purpose of identifying violations of Sections 4c(a)(5)(C) and 6(c)(1)of the Act and/or Regulation 180.1 in accordance with a Monitoring Agreement consented to and approved by 3 Red and the CFTC.

(d)    For a period of eighteen months commencing from the date of the entry of this Consent Order:

    i.    Defendants must employ: (a) the "Dynamic Max Quantity at Price Tool;" and (b) the "Delayed Replace for Cancel/Replace, as modified, with respect to all of Oystacher's futures trading on U.S. exchanges;

    ii.    3 Red's Chief Compliance Officer must file a sworn affidavit on the first of every month affirming that these trading restrictions and compliance tools remain in place with respect to Oystacher's trading and that Oystacher has not violated any of them.

## V.    CIVIL MONETARY PENALTY

42. Defendants shall pay, jointly and severally, a civil monetary penalty in the amount of two-million, five-hundred thousand dollars ($2,500,000) (the "CMP Obligations"), plus post-judgment interest, within ten (10) days of the entry of this Consent Order. If the CMP Obligation is not paid in full within ten (10) days of the date of the entry of this Consent Order, then post –judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2012).

43. Defendants shall pay their CMP Obligations by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission

Division of Enforcement
ATTN: Accounts Receivables
DOT/FAA/MMAC/AMZ-341
CFTC/CPSC/SEC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
Telephone: (405) 954-7262
nikki.gibson@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

44. Partial Satisfaction: Acceptance by the Commission of any partial payment of Defendants' CMP Obligation shall not be deemed a waiver of their obligations to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## VI.     MISCELLANEOUS PROVISIONS

45. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, email, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

46. Notice: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

Rosemary Hollinger
Deputy Director
Division of Enforcement
Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, Illinois 60661

Notice to the Monitor:

James G. Lundy
Drinker Biddle & Reath LLP
191 N. Wacker Dr., Ste. 3700
Chicago, IL 60606

Notice to Defendants:

Christian Kemnitz
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661

All such notices to the Commission or the Monitor shall reference the name and docket number of this action.

47. Change of Address/Phone:  Until such time as Defendants satisfy in full their CMP Obligation and the period of monitoring has elapsed, as set forth in this Order, Defendants shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten (10) calendar days of the change.

48. Entire Agreement and Amendments: The Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

49. Invalidation:  If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

50. Waiver: The failure of any party to this Consent Order at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provisions contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

51. Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by the Defendants to modify, or for relief from, the terms of this Order.

52. Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

53. Contempt:  Defendants understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

54. Agreements and Undertakings: Defendants shall comply with all of the undertakings and agreements set forth in this Consent Order.

**SO ORDERED,** at Chicago, Illinois on this 20th day of December, 2016

_Amy J. St. E_

AMY J. ST. EVE
UNITED STATES DISTRICT JUDGE

**CONSENTED TO:**

_Igor B. Oystacher_

Igor B. Oystacher
3 Red Trading LLC,

APPROVED AS TO FORM:

By: /s/ Christian Kemnitz
Christian Kemnitz
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Christian.kemnitz@kattenlaw.com

Dated: _____, 2016

U.S. Commodity Futures Trading Commission,

By: /s/ Rosemary Hollinger
Rosemary Hollinger
Deputy Director
Division of Enforcement
525 W. Monroe St., #1100
Chicago, IL 60661
(312) 596-0520
_rhollinger@cftc.gov_

By: /s/ Elizabeth M. Streit
Elizabeth M. Streit
Chief Trial Attorney
525 W. Monroe St., #1100
Chicago, IL 60661
(312) 596-0537
_estreit@cftc.gov_

By: /s/ Jon J. Kramer
Jon J. Kramer
525 W. Monroe St., #1100
Chicago, IL 60661
(312) 596-0563
_jkramer@cftc.gov_

By: /s/ Allison V. Passman
Allison V. Passman

525 W. Monroe St., #1100
Chicago, IL 60661
(312) 596-0704
*apassman@cftc.gov*

By: <u>/s/ Daniel R. Burstein</u>
Daniel R. Burstein
525 W. Monroe St., #1100
Chicago, IL 60661
(312) 596-0697
*dburstein@cftc.gov*


Dated:_____, 2016